**Nos. 25-8061 and 25-8065**

**ORAL ARGUMENT REQUESTED**

**UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT**

---

PACIFICORP, a/k/a Rocky Mountain Power,
Plaintiff – Appellee,
v.
WYOMING INDUSTRIAL ENERGY CONSUMERS,
Intervenor Defendant – Appellant,
and
CHRISTOPHER BOSWELL, et al.,
Defendants.

---

PACIFICORP, a/k/a Rocky Mountain Power,
Plaintiff – Appellee,
v.
CHRISTOPHER BOSWELL, et al.,
Defendants – Appellants,
and
WYOMING INDUSTRIAL ENERGY
CONSUMERS,
Intervenor Defendant.

---

*On Appeal from the United States District Court for the District of Wyoming
Hon. Kelly H. Rankin, U.S. District Court Judge
District Court Case No. 24-CV-101-KHR*

---

# JOINT PRELIMINARY OPENING BRIEF OF APPELLANTS

---

James Peters
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
James.peters@wyo.gov

*Attorney for Appellants Christopher Boswell, Christopher B. Petrie, and Michael M. Robinson, in their official capacities as Commissioners of the Public Service Commission of Wyoming*

Kristina (Tina) Van Bockern
Austin W. Jensen
HOLLAND & HART LLP
555 Seventeenth Street, Suite 3200
Denver, CO 80202
Phone: (303) 295-8000
trvanbockern@hollandhart.com
awjensen@hollandhart.com

*Attorneys for Appellant Wyoming Industrial Energy Consumers*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........ vi

STATEMENT OF RELATED CASES ........ xi

GLOSSARY OF TERMS ........ xii

INTRODUCTION ........ 1

JURISDICTIONAL STATEMENT ........ 5

ISSUES PRESENTED ........ 6

STATEMENT OF THE CASE ........ 7

I. Factual and Regulatory Background ........ 7

A. FERC and State Jurisdiction ........ 7

B. North American Electric Reliability Corporation ("NERC") Power Reliability Requirements ........ 8

C. Recovery of Reserve Service Costs from FERC-Jurisdictional Customers ........ 9

**1.** FERC-Required Third-Party Reserves (Schedules 3/3A, 5, and 6) ........ 9

**2.** FERC Approved PacifiCorp's Third-Party Reserves Rates ........ 10

D. Recovery of Reserve Service Costs from Wyoming-Jurisdictional Customers ........ 12

**1.** Base Rates ........ 12

**2.** Energy Cost Adjustment Mechanism ("ECAM") ........ 14

II. Proceedings at the Commission ........ 15

A. 2023 Rate Case and 2024 Order ........ 15

**1.** PacifiCorp's Application to Increase Retail Rates ........ 15

**2.** PacifiCorp's Aurora Model ....... 15

**3.** A Computer Model Gone Wrong and WIEC's Recommendation ....... 16

**4.** The Commission Rejected the Aurora Model ....... 19

B. PacifiCorp Abandoned Aurora in the New Rate Case ....... 20

III. Litigation History ....... 21

A. State Court Appeal ....... 21

B. Federal Lawsuit ....... 22

**1.** Initial Motions to Dismiss ....... 22

**2.** Final Order and Related Pleadings ....... 23

SUMMARY OF ARGUMENT ....... 26

ARGUMENT ....... 27

I. The District Court Erred in Failing to Dismiss PacifiCorp's Claims as Moot ....... 27

A. Standard of Review ....... 27

B. *Ex parte Young*, PacifiCorp's Requested Relief, and the District Court's Initial Order Denying Motions to Dismiss ....... 27

C. PacifiCorp Abandoned Aurora for Setting Rates ....... 29

D. The District Court Erred in Maintaining Jurisdiction Following the 2025 Order ....... 31

**1.** The District Court Improperly Concluded PacifiCorp's Claims Were Not Moot ....... 31

**2.** The District Court Improperly Concluded the Alleged Conduct was Capable of Repetition Yet Evading Review ....... 36

II. The District Court Erred in Granting Summary Judgment ....... 38

A. Standard of Review ........ 39

B. The District Court Committed Legal Error by Misapplying the Filed Rate Doctrine and Failing to Identify any FERC Order Preempting the Commission's Adjustment ........ 39

**1.** Components of FERC Jurisdiction and the Filed Rate Doctrine ........ 40

**2.** The District Court Failed to Identify a FERC Order or Mandate ........ 44

C. The District Court Ignored Several Disputes of Material Fact Demonstrating that Preemption Does Not Apply ........ 46

**1.** The District Court Did Not Identify a FERC-Approved Rate ........ 47

**2.** 2024 Order Did Not Interfere with a FERC-Approved Methodology ........ 52

**3.** The District Court Erroneously Limited Its Analysis to the "Face of the Commission's Order" ........ 58

III. The District Court Erred in Failing to Dismiss Under the *Burford* Abstention Doctrine ........ 62

A. Standard of Review ........ 62

B. This Case Implicates a Purely State Retail Ratemaking Function ........ 63

CONCLUSION ........ 64

STATEMENT CONCERNING ORAL ARGUMENT ........ 64

CERTIFICATE OF COMPLIANCE ........ 66

CERTIFICATE OF SUBMISSION OF HARD COPIES OF PLEADINGS ........ 67

CERTIFICATE OF SERVICE ........ 67

ATTACHMENTS ........ 68

Att. 1, Order Denying Commission's and WIEC's Motion to Dismiss, ECF No. 47 (Oct. 1, 2024) ................................69

Att. 2, Order Denying Commission's and WIEC's Joint Motion to Dismiss and Granting PacifiCorp's Motion for Summary Judgment, ECF No. 88 (Sept. 10, 2025)....................100

Att. 3, Final Judgment, ECF No. 89 (Sept. 10, 2025).......................................................114

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdurrahman v. Dayton*,
903 F.3d 813 (8th Cir. 2018) .................... 37

*ANR Pipeline Co. v. LaFaver*,
150 F.3d 1178 (10th Cir. 1998) .................... 35

*Baker v. USD 229 Blue Valley*,
979 F.3d 866 (10th Cir. 2020) .................... 27

*Bldg. Indus. Elec. Contrs. Ass'n ex rel. United Elec. Contrs. Ass'n v. City of New York*, 678 F.3d 184 (2d Cir. 2012) .................... 61

*Brown v. Buhman*,
822 F.3d 1151 (10th Cir. 2016) .................... 27, 31, 32

*Burford v. Sun Oil Co.*,
319 U.S. 315 (1943) .................... 3

C*hamber of Com. of the U.S. v. Edmondson*,
594 F.3d 742 (10th Cir. 2010) .................... 28

*Delgado v. Gonzales*,
428 F.3d 916 (10th Cir. 2005) .................... 27, 28

*EEOC v. PJ Utah, LLC*,
822 F.3d 536 (10th Cir. 2016) .................... 5

*Entergy La., Inc. v. La. PSC*,
539 U.S. 39 (2003) .................... 40

*Estate of Schultz v. Brown*,
846 Fed. Appx. 689 (10th Cir. 2021) .................... 33, 34

*Ex parte Young*,
209 U.S. 123 (1908) .................... 28

*Fed. Power Comm'n v. Fla. Power & Light Co.*,
404 U.S. 453 (1972) .................... 7

*Fed. Power Comm'n v. S. Cal. Edison Co.*,
376 U.S. 205 (1964) .................... 7

*FERC v. Elec. Power Supply Ass'n*,
577 U.S. 260 (2016) .................... 7

*Geier v. Am. Honda Motor Co.*,
529 U.S. 861 (2000) .................... 61

*Green v. Mansour*,
474 U.S. 64 (1985) .................... 33

*Hughes v. Talen Energy Mktg.*,
578 U.S. 150 (2016) .................... 40, 41, 43, 44

*Johnson v. Rancho Santiago Cmty. College Dist.*,
623 F.3d 1011 (9th Cir. 2010) .................... 61

*Jordan v. Sosa*,
654 F.3d 1012 (10th Cir. 2011) .................... 36

*Keller Tank Servs. II v. Comm'r*,
854 F.3d 1178 (10th Cir 2017) .................... 27

*Koel v. Citizens Med. Ctr., Inc.*,
128 F.4th 1329 (10th Cir. 2025) .................... 39

*Lewis v. Continental Bank Corp.*,
494 U.S. 472 (1990) .................... 36

*Marshall v. El Paso Natural Gas Co.*,
874 F.2d 1373 (10th Cir. 1989) .................... 62

*Miss. Power & Light Co. v. Mississippi*,
487 U.S. 354 (1988) .................... 40, 42, 43, 44

*Murphy v. Hunt*,
455 U.S. 478 (1982) .................... 37

*Muscogee (Creek) Nation v. Pruitt*,
669 F.3d 1159 (10th Cir. 2012) .................... 28, 32, 38

*N. Ill. Chapter of Assoc. Builders & Contrs., Inc. v. Lavin*,
431 F.3d 1004 (7th Cir. 2005) .................... 61

*Nantahala Power & Light Co. v. Thornburg*,
476 U.S. 953 (1986) .................................................. 40, 41, 42, 44, 51

*New York v. FERC*,
535 U.S. 1 (2002) ...................................................................... 7, 49, 60, 62

*New York v. FERC*,
783 F.3d 946 (2d Cir. 2015) ........................................................................ 8

*Obermeyer Hydro Accessories, Inc. v. CSI Calendaring, Inc*,
852 F.3d 1008 (10th Cir. 2017) ................................................................... 39

*Oneok, Inc. v. Learjet, Inc.*,
575 U.S. 373 (2015) ...................................................................................... 45

*Papasan v. Allain*,
478 U.S. 265 (1986) ...................................................................................... 32

PG*&E v. Lynch*,
216 F. Supp. 2d 1016 (N.D. Cal. 2002)....................................................... 40

*Robert v. Austin*,
72 F.4th 1160 (10th Cir. 2023) .................................................................... 36

*Shields L. Grp., LLC v. Stueve Siegel Hanson LLP*,
95 F.4th 1251 (10th Cir. 2024) .................................................................... 31

*Sierra Club v. Two Elk Generation Partners, L.P.*,
646 F.3d 1258 (10th Cir. 2011) ................................................................... 56

*Tarrant Reg'l Water Dist. v. Sevenoaks*,
545 F.3d 906 (10th Cir. 2008) ..................................................................... 35

*Transmission Access Policy Study Group v. FERC*,
225 F.3d 667 (D.C. Cir. 2000) ....................................................................... 8

*United States v. Durham*,
902 F.3d 1180 (10th Cir. 2018) ............................................................ 62, 63

*Univ. of Tennessee v. Elliott*,
478 U.S. 788 (1986) ...................................................................................... 56

*Williston Basin Interstate Pipeline Co. v. FERC*,
165 F.3d 54 (D.C. Cir. 1999) ....................................................................... 11

**Federal Statutes**

16 U.S.C. §§ 791a *et seq.* .......... 5

16 U.S.C. § 824(b)(1) .......... 7, 47

16 U.S.C. § 824(c) .......... 7

16 U.S.C. § 824d(a) .......... 40, 44

16 U.S.C. § 824o(b)(1) .......... 8

16 U.S.C. § 824o(c) .......... 8

16 U.S.C. § 824o(d) .......... 8

16 U.S.C. § 824(d) .......... 7

28 U.S.C. § 1331 .......... 5

28 U.S.C. § 1337 .......... 5

42 U.S.C. § 1983 .......... 5, 22

**Wyoming Statutes**

Wyo. Stat. § 37-3-106(c) .......... 34

**Regulations**

18 C.F.R. § 35.4 .......... 54

023-0002-2 Wyo. Code R. §§ 5–31 .......... 35

**Rules**

Fed. R. Civ. P. 56(a) .......... 39

**Federal Administrative Decisions**

*Middle S. Energy*, 32 FERC ¶ 61,425 (1985) .......... 42

*N. Am. Elec. Reliability Corp.*, 116 FERC ¶ 61,062 (2006) .......... 8

*Nantahala Power & Light Co. Highlands v.*
*Nantahala Power & Light Co.*, 19 FERC ¶ 61,152 (1982) .......................... 41

Order No. 888, 75 FERC ¶ 61,080 (1996) ........................................................ 9

**Wyoming Administrative Decisions**

*In re Rocky Mountain Power*, 2023 Wyo. PUC Lexis 64,
Docket No. 20000-578-ER-20 (Record No. 15464)
(WY P.S.C. Mar. 9, 2023) ........................................................................ 37

## STATEMENT OF RELATED CASES

The following related case also seeks judicial review of the rate order at issue and is pending in the district court of the First Judicial District, Laramie County, State of Wyoming:

*PacifiCorp v. Boswell, et al.*, 2024-CV-0202385

## GLOSSARY OF TERMS

| | |
|---|---|
| Commission | Wyoming Public Service Commission |
| ECAM | Energy Cost Adjustment Mechanism |
| FERC | Federal Energy Regulatory Commission |
| FPA | Federal Power Act |
| IRP | Integrated Resource Plan |
| MP&L | Mississippi Power & Light Company |
| MPSC | Mississippi Public Service Commission |
| MW | Megawatts |
| NCUC | Utilities Commission of North Carolina |
| NERC | North American Electric Reliability Corporation |
| NPC | Net Power Costs |
| OATT | Open Access Transmission Tariff |
| RTO | Regional Transmission Organization |
| TVA | Tennessee Valley Authority |
| WIEC | Wyoming Industrial Energy Consumers |

## INTRODUCTION

This case concerns who decides how much Wyoming electricity customers pay for power grid reliability costs—the Wyoming Public Service Commission (the "Commission") that regulates those costs, or PacifiCorp through its computer model.

PacifiCorp, one of Wyoming's electric utilities, must hold some power plant capacity in reserve to maintain grid reliability. These "reserve services" are required by federal reliability standards, but the costs fall on different customer groups: *fixed* costs (such as the costs to construct the plant) are recovered in part from interstate transmission customers through PacifiCorp's Federal Energy Regulatory Commission ("FERC") rates, while the remaining *fixed* costs and *variable* costs (such as fuel costs) are recovered from Wyoming retail customers through rates set by the Commission. This case focuses only on the *variable* costs Wyoming customers pay.

In a 2023 rate case before the Commission, PacifiCorp introduced a computer model called "Aurora" to estimate, among other things, the variable costs to Wyoming customers when PacifiCorp provides reserve services. But Aurora was fundamentally flawed and drastically inflated PacifiCorp's variable costs for reserve services. In its January 2, 2024 rate order (the "2024 Order"), the Commission rejected Aurora's inflated variable cost estimates and instead reduced the estimate by $23.5 million.

Following the 2024 Order, PacifiCorp did two things. *First*, PacifiCorp sued the Commission in the United States District Court for the District of Wyoming (the "district court"). PacifiCorp argued the 2024 Order violated the filed rate doctrine, a form of preemption that prohibits state regulators from adopting any rate other than that filed with FERC as a reasonably incurred wholesale cost. PacifiCorp requested an additional $23.5 million to reflect reversal of the Commission's adjustment because, according to PacifiCorp, FERC preempted the adjustment.

*Second*, after filing the appeal, PacifiCorp filed a new Wyoming rate case that did not rely on Aurora. That case resulted in a settlement and a June 2, 2025, Commission order (the "2025 Order") setting new Wyoming rates that "do not rely on the Aurora model" at all.

The district court took a cursory look at "what appears on the face of the [2024] Order," presumed the Commission's intent, and agreed with PacifiCorp, granting its motion for summary judgment. The district court got three things wrong.

*First*, the district court erred in keeping the case alive after the 2025 Order established new rates that do not rely on Aurora and superseded the 2024 Order. Under *Ex parte Young*, once the 2024 Order was no longer in effect, PacifiCorp's request for prospective relief from an ongoing violation of federal law was mooted.

*Second*, the district court erred in granting summary judgment without identifying the most basic requirement for federal preemption: a FERC mandate. FERC never set a rate reflecting, or approved a methodology for determining, the *variable* cost impact on Wyoming retail customers when PacifiCorp provides reserve services. FERC has never seen, approved, or used Aurora in this context. PacifiCorp—not FERC—used Aurora to forecast the variable costs, which, based on errors, manipulations, and lack of transparency, the Commission found faulty and invalid.

Presented with an unreliable forecast, the Commission adopted the Wyoming Industrial Energy Consumers' ("WIEC") proposed adjustment. WIEC's adjustment removed *some* of the reserves PacifiCorp assumed in Aurora. Crucially though, the adjustment included [redacted]% more capacity for reserves than PacifiCorp argued to FERC was necessary when setting FERC rates. Because no FERC rate exists for the variable costs at issue in this case, and because WIEC's adjustment used by the Commission included far more reserves than were reflected in the FERC proceeding that set PacifiCorp's rates for the fixed costs of reserves, the district court could not have found preemption.

*Third*, the district court erred when it refused to let the state court handle what is fundamentally a state utility dispute under *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). Federal courts should abstain from considering

complex state regulatory matters unless there's a clear federal issue. Here, the only dispute was whether the Commission should accept a demonstrably unreliable computer model that inflated costs.

Ultimately, the district court's decision threatens to federalize state utility regulation by allowing utilities to invoke federal preemption whenever state regulators reject their cost forecasts—even when those forecasts are based on fundamentally flawed models that federal regulators have not used or approved. This Court should reverse and restore the proper balance between federal and state authority in utility regulation.

## JURISDICTIONAL STATEMENT

On May 16, 2024, PacifiCorp sued Defendants-Appellants in their official capacities as Commissioners in the district court. Vol. 1, A-0016 ¶5. PacifiCorp sought declaratory and injunctive relief under 42 U.S.C. § 1983, claiming that the 2024 Order was preempted by the Federal Power Act ("FPA"), 16 U.S.C. §§ 791a *et seq.*, and the Supremacy Clause of the U.S. Constitution. Vol. 1, A-0031–43. The district court asserted federal question jurisdiction under 28 U.S.C. §§ 1331 and 1337. Vol. 2, A-0406. Intervenor Defendant-Appellant WIEC intervened.

On September 10, 2025, the district court granted PacifiCorp's motion for summary judgment, denied the Commission and WIEC's joint motion to dismiss, and entered final judgment. Vol. 12, A-2060–72; *id.* at A-2073.

On October 3, 2025, WIEC timely filed its notice of appeal. Vol. 12, A-2074–76. The Commissioners timely filed their notice of appeal on October 10, 2025. *Id.* at A-2077–79. Because this appeal arises from a judgment that disposes of the parties claims, this Court has jurisdiction pursuant to 28 U.S.C. § 1291. *EEOC v. PJ Utah, LLC*, 822 F.3d 536, 541 (10th Cir. 2016).

## ISSUES PRESENTED

1. Did the district court err when it denied Appellants' motion to dismiss PacifiCorp's claims under *Ex parte Young* as moot after PacifiCorp requested, and the Commission approved, new rates that superseded the 2024 Order?

2. Did the district court err by finding preemption without identifying any FERC mandate, and despite disputed material facts?

3. Did the district court abuse its discretion when it denied Appellants' motion to dismiss under the *Burford* abstention doctrine because this case implicates a purely state retail ratemaking function?

## STATEMENT OF THE CASE

### I. Factual and Regulatory Background

#### A. FERC and State Jurisdiction

FERC has jurisdiction over (1) "the sale of electric energy at wholesale in interstate commerce" and (2) "the transmission of electric energy in interstate commerce." 16 U.S.C. § 824(b)(1); *see also New York v. FERC*, 535 U.S. 1, 16–17 (2002) (discussing distinction between transmission and wholesale authority). A wholesale sale is a "sale of electric energy to any person for resale." 16 U.S.C. § 824(d). FERC's transmission jurisdiction has been interpreted to extend to any transmission of electricity that may commingle with electricity on the bulk transmission system. *See Fed. Power Comm'n v. Fla. Power & Light Co.*, 404 U.S. 453, 462–63 (1972); 16 U.S.C. § 824(c).

Other than these functions, FERC jurisdiction "shall not apply to any other sale of electric energy," including "retail sales of electricity." *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 267 (2016) (quoting 16 U.S.C. § 824(b)(1)). Retail sales of electricity are those sales "to ultimate consumers." *See Fed. Power Comm'n v. S. Cal. Edison Co.*, 376 U.S. 205, 214 (1964). "Pursuant to these provisions, FERC has regulated wholesale power sales and interstate transmissions, and state agencies have retained jurisdiction over bundled retail transactions, including service issues and the intrastate sale

and distribution of electricity through local distribution facilities." *Transmission Access Pol'y Study Grp. v. FERC*, 225 F.3d 667, 691 (D.C. Cir. 2000).

### B. North American Electric Reliability Corporation ("NERC") Power Reliability Requirements

"For many years, FERC exercised its statutory jurisdiction essentially as an economic regulator, overseeing the market for the sale of electricity in interstate commerce." *New York v. FERC*, 783 F.3d 946, 950 (2d Cir. 2015). Following regional reliability issues in 2003, however, Congress created Section 215 of the FPA and authorized "FERC to adopt and enforce mandatory technical reliability standards for facilities" on the "bulk-power system." *Id.*; 16 U.S.C. § 824o(b)(1).

Section 215 vests the responsibility for creating mandatory reliability standards in a non-governmental "Electric Reliability Organization" or "ERO," while FERC selects the ERO and approves the reliability standards if "just, reasonable, not unduly discriminatory or preferential, and in the public interest." 16 U.S.C. § 824o(c), (d). FERC selected NERC to be the ERO. *N. Am. Elec. Reliability Corp.*, 116 FERC ¶ 61,062 (2006).

NERC requires electric transmission grid operators to maintain reliability by operating their grids in balance, which generally means that electricity put into the grid must be in balance with the electricity taken off the

grid. Vol. 7, A-1201 ¶12. Thus, NERC promulgated, and FERC approved, several reliability standards that require PacifiCorp to hold some of its generation resources idle so power plants can respond to deviations in generation and load balance on PacifiCorp's transmission system for both FERC- and state-jurisdictional customers. *Id.*; *id.* at A-1202 ¶16. Colloquially, this requirement is called the obligation to provide "reserve services" because generation must be held back, or in reserve. *Id.* at A-1202 ¶16.

### C. Recovery of Reserve Service Costs from FERC-Jurisdictional Customers

#### 1. FERC-Required Third-Party Reserves (Schedules 3/3A, 5, and 6)

PacifiCorp recovers the cost of providing reserve services in part from FERC-jurisdictional customers through its FERC-approved "ancillary service" rates, which are one component of PacifiCorp's FERC-regulated Open Access Transmission Tariff ("OATT"). Order No. 888, 75 FERC ¶ 61,080, 31,703 (1996). Specifically, the ancillary service schedules that recover the cost of providing reserve services to PacifiCorp's FERC-jurisdictional customers include Schedules 3/3A, Schedule 5, and Schedule 6 (collectively "Third-Party Reserves"). Vol. 2, A-0510–30.[1]

---

[1] The term "Third-Party Reserves" is used because PacifiCorp does not provide these services to itself for its own state-jurisdictional retail customers.

### 2. FERC Approved PacifiCorp's Third-Party Reserves Rates

FERC accepted (without approving any methodology) PacifiCorp's current Third-Party Reserve rates in FERC Docket No. ER21-1015-000. Vol. 2, A-0532–33; Vol. 9, A-1316. In that case, FERC approved a settlement that set Third-Party Reserve rates lower than PacifiCorp's "base case" study. Vol. 9, A-1236. While the settlement "was negotiated on a black box basis, rather than calculated based on specific cost-of-service data," "PacifiCorp … includ[ed] its base case cost support to demonstrate the justness and reasonableness of the" settlement's Third-Party Reserves rates. *Id.* at A-1237. PacifiCorp's base case study generally followed two steps.

*First*, PacifiCorp conducted a reserve study, which "assessed the reserves need[ed] by PacifiCorp to provide these services in light of the most recent data and the requirements of the [NERC] reliability standards, and identified the PacifiCorp resources that provide these services." *Id.* at A-1245. This is called a "units most likely" reserve study.

PacifiCorp's units most likely study demonstrated that only 996.3 megawatts ("MW") of total reserves was necessary to satisfy NERC's requirements, including reserves needed to: (1) provide Third-Party Reserves to FERC-jurisdictional customers; *and* (2) balance PacifiCorp's own load and

resources for purposes of serving state-jurisdictional customers. Vol. 7, A-1202 ¶17; Vol. 9, A-1247–50.

*Second*, this reserve requirement was "used for developing rates" for each Third-Party Reserve schedule. Vol. 9, A-1247. Particularly, after identifying the "resources that provide [reserve] services," (*id.* at A-1245), PacifiCorp completed a series of calculations "to arrive at the revenue requirement of providing the applicable ancillary service." *Id.* at A-1258–59.[2] PacifiCorp then divided the revenue requirement by FERC-jurisdictional customer kilowatts (for Schedules 3/3A) and MW-hours (for Schedules 5 and 6) "to arrive at the ancillary service rate." *Id.* at A-1259.

Importantly, PacifiCorp's Third-Party Reserve rates recover only the "fixed capacity costs" of the "units most likely … to provide each particular reserve" service. *Id.* at A-1246–47, 1258–59. Fixed costs are those that do not vary with output, such as construction costs. Vol. 7, A-1222 ¶28. Third-Party Reserve rates do not recover variable costs. Vol. 9, A-1260–61; *see also* Vol. 7, A-1209 ¶10; *id.* at A-1224 ¶34; *id.* at A-1227 ¶41. Variable costs fluctuate based on customer or generator use, such as the price of fuel. Vol. 7, A-1222

---

[2] "Revenue requirement" is the "cost of service plus reasonable profit." *See, e.g.*, *Williston Basin Interstate Pipeline Co. v. FERC*, 165 F.3d 54, 57 (D.C. Cir. 1999).

¶28. Accordingly, PacifiCorp's Third-Party Reserve Rates recover only the fixed costs of providing reserve services to FERC-jurisdictional customers.

While FERC set PacifiCorp's Third-Party Reserve rates based on the generation units most likely to provide the service, (Vol. 9, A-1246–47, A-1258–59), neither FERC nor NERC dictate which generation resources must be used to meet reserve requirements in actual operations; hence, units *most likely*. Instead, PacifiCorp decides how to optimally dispatch its resources to: (1) hold retail reserves and Third-Party Reserves; and (2) generate electricity to serve retail customers or to make off-system sales. Vol. 7, A-1202 ¶16; *id.* at A-1210 ¶11; Vol. 9, A-1289–90.

### D. Recovery of Reserve Service Costs from Wyoming-Jurisdictional Customers

#### 1. Base Rates

FERC does not and cannot set Wyoming retail rates associated with Wyoming's portion of the 996.3 MW needed to provide reserve services to Wyoming customers. Vol. 7, A-1203 ¶21. Rather, PacifiCorp recovers both the fixed and variable cost of providing reserve services *to its Wyoming customers* through retail rates established by the Commission. *Id.* at ¶¶20–21.

##### a. Wyoming Fixed Cost Recovery

PacifiCorp's retail base rates are set by considering 100 percent of the Wyoming-allocated fixed costs of generation, *including fixed costs for providing FERC-jurisdictional Third-Party Reserves*. Then, the Commission credits the

revenues PacifiCorp earns from charging the Third-Party Reserve rates to PacifiCorp's FERC-jurisdictional customers by subtracting those from the entirety of the approved fixed costs of generation used to provide reserves. Vol. 7, A-1211–12 ¶12; *id.* at A-1223 ¶31; Vol. 9, A-1291.

This revenue crediting model "ensures that PacifiCorp recovers its transmission expenditures, and both wholesale and retail customers only pay their proportional share of the [PacifiCorp] transmission system." Vol. 9, A-1291. PacifiCorp's Third-Party Reserve rates were projected to recover approximately $12.2 million in fixed costs. Vol. 7, A-1227 ¶41. Thus, in the normal course, Wyoming retail rates would collect 100 percent of the fixed costs of reserve services, including Third-Party Reserves, less a FERC revenue credit of $12.2 million.

**b. Wyoming Variable Cost Recovery**

Variable energy costs are generally recovered through net power costs ("NPC") via base rates and the Energy Cost Adjustment Mechanism. *Id.* at A-1223 ¶30. When PacifiCorp holds generation idle for reserve services, alternative generation may have higher variable costs, resulting in higher customer energy costs. The estimation of this variable cost impact is what is at issue in this case. *Id.* at A-1224 ¶33.

Importantly, there is no FERC rate associated with, or designed to recover, the incremental variable cost to retail customers created because of

the obligation to hold generation back to provide Third-Party Reserves. *Id.* at ¶34; *id.* at A-1203 ¶20. Rather, PacifiCorp estimates these costs using a computer model. *Id.* at A-1224–25 ¶35. Based on the Commission's assessment of PacifiCorp's model of future variable energy costs, the Commission sets a "base" level of NPC to be recovered through base rates. Vol. 1, A-0126 ¶203.

### 2. Energy Cost Adjustment Mechanism ("ECAM")

Each April, PacifiCorp files an ECAM application comparing base NPC to actual NPC incurred the prior year. Vol. 7, A-1229 ¶48; Vol. 9, A-1301, A-1304. In making this calculation, PacifiCorp tracks *actual* costs without using computer models, and those actual costs include the cost impact from holding generation for Third-Party Reserves. Vol. 7, A-1229–30 ¶¶49–50. Thus, when actual NPC is calculated for the ECAM, 100 percent of the difference between the base forecast NPC approved in a rate case and the actual NPC incurred are identified. *Id.* at A-1221–22 ¶26; *id.* at A-1223 ¶30; *id.* at A-1230 ¶51; Vol. 9, A-1301, A-1304.

PacifiCorp's rates are then adjusted to reflect 80 percent of any difference, inclusive of a carrying charge. Vol. 7, A-1230 ¶52; Vol. 9, A-1305. The remaining 20 percent is retained or absorbed by PacifiCorp pursuant to Wyoming's incentive ratemaking statute, which incentivizes PacifiCorp to manage variable costs by allowing PacifiCorp to enjoy a share of the benefit

from cost decreases and be at risk for a share of cost increases. Vol. 7, A-1230 ¶¶53–54.

## II. Proceedings at the Commission

### A. 2023 Rate Case and 2024 Order

#### 1. PacifiCorp's Application to Increase Retail Rates

On March 1, 2023, PacifiCorp filed an application with the Commission seeking approval to increase its retail electric service rates by approximately $140.2 million per year (the "2023 Rate Case"). Vol. 1, A-0089 ¶4. WIEC intervened. *Id.* at ¶7. The Commission approved PacifiCorp's application, with adjustments, for a total revenue requirement increase of $53,931,312. *Id.* at A-0086 ¶1. Only one adjustment is at issue: PacifiCorp's forecasted Wyoming-jurisdictional variable cost impact of providing Third-Party Reserves. *Id.* at A-0035–37 ¶¶79–80.

#### 2. PacifiCorp's Aurora Model

FERC neither set a rate nor approved a methodology for determining the variable cost impact on retail customers from Third-Party Reserves. Vol. 7, A-1224 ¶34; *id.* at A-1203 ¶20. Without a FERC rate or methodology, PacifiCorp proposed its own forecasting method. *Id. at* A-1224–25 ¶35. Specifically, PacifiCorp presented a computer model named "Aurora" for the first time in its 2023 Rate Case. *Id.* at A-1207–08 ¶7; Vol. 1, A-0098 ¶71. Aurora replaced PacifiCorp's "GRID" model used since 2008. Vol. 1, A-0098 ¶71. Aurora

performs a numerical simulation; it is not an accounting of actual costs, nor is it used to determine how PacifiCorp operates its system. Vol. 7, A-1215–16 ¶16; *see* Vol. 9, A-1289–90.

Importantly, PacifiCorp never proposed, and FERC has never used, Aurora to set PacifiCorp's FERC rates. Vol. 7, A-1202 ¶18. PacifiCorp proposed to use Aurora at only the state level to forecast the NPC associated with serving Wyoming retail customers, including the estimated variable cost impact of holding Third-Party Reserves. *Id.* at A-1224–25 ¶¶35–36. PacifiCorp ultimately proposed forecast NPC in the amount of $298.7 million on a Wyoming-allocated basis. *Id.* at A-1226 ¶38.[3]

#### 3. A Computer Model Gone Wrong and WIEC's Recommendation

Aurora differs significantly from GRID: "It is primarily a power market model, and it was not designed specifically to simulate single-issue or single-utility closed system dispatch in the same way as the GRID model was." Vol. 9, A-1269. Aurora "is not configured to evaluate reserves for [Third-Party Reserves]." Vol. 7, A-1207–08 ¶7. Accordingly, PacifiCorp manipulated Aurora, attempting to make it function like GRID, incorporating "highly

[3] PacifiCorp reached $298.7 million after two revisions to its initial proposal: It first proposed $360.3 million, then $357.8 million, and finally $298.7 million in exchange for certain beneficial treatment in the design of its ECAM. Vol. 7, A-1226 ¶38.

complicated" modeling and out-of-model assumptions, techniques, and workarounds. *Id.*; *id.* at A-1225 ¶36; Vol. 9, A-1269.

PacifiCorp's manipulated Aurora model included significant errors that drastically inflated the estimated cost impact of holding generation for Third-Party Reserves. Vol. 7, A-1226 ¶39. These errors stemmed from model inputs that overstated reserve requirements, leading to severely exaggerated retail base NPC. *Id.* at A-1212–13 ¶13. For example, WIEC found a $74.1 million error in just one part of Aurora's calculations. *Id.* at A-1226 ¶40.

Further, as noted above, PacifiCorp's FERC-filed Third-Party Reserve rates were derived using a units most likely reserve study—not Aurora—which produced 996.3 MW of *total* reserves. *Id.* at A-1202 ¶17. But PacifiCorp included [redacted] MW of total reserves in Aurora—[redacted] MW *more* capacity than the level reflected in PacifiCorp's FERC filing. *Id.* at A-1225 ¶37; Vol. 8, A-1225 ¶37. By holding more generation for reserves than required, PacifiCorp's Aurora model overstates the variable cost impact associated with those reserves. *See* Vol. 7, A-1218–19 ¶19, A-1226 ¶39.

Because Aurora was error-ridden and untrustworthy, WIEC recommended a commonsense solution: "Limit the modeled cost of third-party reserves included in NPC *to the FERC-approved costs* that [PacifiCorp] recovers from those customers." Vol. 9, A-1270 (emphasis added). WIEC's adjustment involved two steps.

*First*, WIEC's adjustment removed from Aurora the portion of reserves PacifiCorp assumed for Third-Party Reserves, which resulted in a $175.5 million total-company[4] NPC decrease. Vol. 7, A-1226 ¶40; *id.* at A-1227 ¶42. *Second*, WIEC proposed that: (1) Wyoming customers continue to pay 100 percent of the fixed costs of all resources, including those used to provide Third-Party Reserves; and (2) PacifiCorp keep (rather than credit retail customers) the Third-Party Reserves revenues. *Id.* at A-1227 ¶¶41–42. This adjustment gave PacifiCorp full fixed cost recovery plus $12.2 million as a proxy for variable costs. *Id.* at ¶43.

In addition to providing $12.2 million as a proxy for variable cost, WIEC's adjustment only removed 142 MW of PacifiCorp's proposed [redacted] MW, leaving [redacted] MW, or [redacted] MW *more* capacity for reserves than the 996.3 MW PacifiCorp itself argued was necessary at FERC. *Id.* at A-1228 ¶45; Vol. 8, A-1228 ¶45. WIEC's recommendation also compares favorably to PacifiCorp's 2025 Integrated Resource Plan ("IRP"),[5] published on March 31, 2025: The IRP indicated that PacifiCorp needed 1,085 MW of capacity for

---

[4] PacifiCorp provides retail service in six states, including Wyoming. Vol. 1, A-0017 ¶¶11–12. Aurora attempts to calculate NPC across all six states, and any adjustments must be made to total-company results. Wyoming only pays its share of total-company costs.

[5] PacifiCorp's IRP is a biennial planning document wherein PacifiCorp details its resources needed to serve current and projected electric demand.

reserves in 2025, or [redacted] MW *less* than WIEC's recommended amount. Vol. 7, A-1228 ¶46; Vol. 8, A-1228 ¶46.

Ultimately, WIEC clarified that its adjustment was "not a disallowance." *Id.* On the contrary, "[i]t is merely revaluing the third-party reserves in NPC *in the same way that FERC values them*." Vol. 9, A-1270 (emphasis added).

### 4. The Commission Rejected the Aurora Model

Based on myriad errors and manipulations, the Commission admonished PacifiCorp for lack of transparency related to Aurora. Vol.1, A-0126 ¶204. It stated that it did "not derive a great deal of confidence in the usefulness of the Aurora model for evaluating forecast NPC, as presented by PacifiCorp in [its 2023 Rate Case]." *Id.* Thus, the Commission concluded that PacifiCorp "failed to demonstrate in accordance with its burden of proof that its use of Aurora, including material adjustments to NPC estimates ..., was valid." *Id.*

Instead, the Commission found WIEC's adjustment "credible and persuasive." *Id.* at A-0128 ¶215. While the adjustment rejected *PacifiCorp*'s erroneous Aurora modeling, it honored FERC-approved costs. Vol. 7, A-1226 ¶¶40–41; *id.* at A-1202 ¶¶17–18. The Commission concluded that the adjustment was "needed to revalue third-party reserves in NPC *in the same manner that FERC values them*." Vol. 1, A-0128 ¶215 (emphasis added).

The adjustment resulted in a $23.5 million difference[6] relative to PacifiCorp's first-revised Aurora forecast of NPC—$357.8 million. Vol. 7, A-1228 ¶44. However, PacifiCorp later reduced its ask to $298.7 million at hearing. *Id.* at A-1226 ¶38. Using PacifiCorp's revised request, the Commission-adopted adjustment resulted in a forecast of $304.1 million, or $5.4 million *higher* than PacifiCorp ultimately conditionally requested. *Id.* at A-1221–22 ¶26.

On April 19, 2024, PacifiCorp filed an application for rehearing, which the Commission denied. *See* Vol. 9, A-1308–13.

### B. PacifiCorp Abandoned Aurora in the New Rate Case

On August 2, 2024, PacifiCorp filed a new rate case (the "2024 Rate Case"). Vol. 10, A-1360–79. After the Commission found Aurora invalid, PacifiCorp disavowed use of Aurora in its 2024 Rate Case. Vol. 12, A-1943–44 (PacifiCorp Director, Net Power Costs stating that PacifiCorp's application "does not depend on Aurora"). Instead, PacifiCorp requested to maintain the *same* amount of base NPC approved in the 2024 Order, asserting that it would be "in the public interest and will result in just and reasonable rates." Vol. 10, A-1368, A-1377.

---

[6] This $23.5 million is the calculation of Wyoming's allocated share of total-company costs ($175.5 million) minus $12.2 million. Vol. 7, A-1227 ¶42.

On March 4, 2025, PacifiCorp, WIEC, and the Wyoming Office of Consumer Advocate filed a settlement agreement stipulating to an $85.5 million revenue requirement increase with base NPC of $304,124,550 which, notwithstanding changes in PacifiCorp's system since the prior general rate case, was the same dollar amount previously approved but without using or endorsing the methodology now under appeal. *Id.* at A-1380–95, A-1383–84. PacifiCorp confirmed the "settlement and … base net power costs do not rely on the Aurora model." Vol. 10, A-1559.

On June 2, 2025, the Commission issued its final decision (the "2025 Order") approving the settlement, finding the settlement "consistent with the public interest and results in just and reasonable rates," and noting that approval "does not constitute the Commission's or the Parties' acceptance of the Aurora power cost model." Vol. 11, A-1751 ¶201, A-1752 ¶209.

The rates approved in the 2025 Order became "effective for service rendered on and after June 1, 2025," superseding the rates established by the 2024 Order. *Id.* at A-1756 ¶1.

## III. Litigation History

### A. State Court Appeal

On May 17, 2024, PacifiCorp filed a petition for review of the 2024 Order in Wyoming state court, challenging the decision on several grounds and reserving "for review in a federal forum" the claim that the 2024 Order

"violates the Supremacy Clause and the Federal Power Act" by "overrul[ing] a filed rate." Vol. 1, A-0068–73. PacifiCorp's claims are currently pending in state court.

### B. Federal Lawsuit

PacifiCorp also challenged the 2024 Order in the district court, asserting that the 2024 Order was preempted because it disregarded FERC-mandated rates. Vol. 1 A-0031–41. PacifiCorp requested a declaration and injunction under 42 U.S.C. § 1983 to reverse WIEC's adjustment and increase PacifiCorp's revenue requirement by $23.5 million. *Id.* at A-0042–43 ¶¶94–97.

#### 1. Initial Motions to Dismiss

On July 12, 2024, the Commission filed a motion to dismiss contending that PacifiCorp's claims were barred by Eleventh Amendment immunity and that *Burford* abstention applied. Vol. 1, A-0052–65.

On July 22, 2024, WIEC filed a motion to dismiss, arguing that PacifiCorp's requested relief was "crafted under the guise of federal law as an end-run around its failure to present accurate or reliable modeling" in a state retail ratemaking proceeding and, as such, *Burford* abstention applied. Vol. 1, A-0082–83, A-0189.

The district court denied both motions. Vol. 2, A-0422. It concluded that the *Ex parte Young* doctrine applied, that PacifiCorp was seeking "prospective relief," and that "[s]o long as the Commission's Order is *still in effect*, there is

an alleged ongoing violation of federal law." Vol. 2, A-0401 (emphasis added). Likewise, the district court concluded that *Burford* abstention was unwarranted. *Id.* at A-0413–21.

### 2. Final Order and Related Pleadings

#### a. Motion for Summary Judgment

On March 7, 2025, PacifiCorp moved for summary judgment on its preemption claim. Vol. 2, A-0503. PacifiCorp argued that the "Commission lowered PacifiCorp's retail rates based on a theory rooted entirely in dissatisfaction with *those FERC-filed rates*," and that the "express intent and clear effect of the ... Commission's decision is to interfere with *federal rates*." *Id.* at A-0480–81 (emphasis added). Without identifying what FERC-approved *rates* preempted WIEC's adjustment, PacifiCorp adopted a second approach to preemption: The Commission "utilizes a completely different *methodology* to value the reserves than FERC." *Id.* at A-0481 (emphasis added).

PacifiCorp claimed the 2024 Order was "preempted on its face" because the Commission "substituted its judgment for FERC's regarding how PacifiCorp should price its ancillary services" and prevented "PacifiCorp from recovering its power costs in a manner consistent with *FERC requirements*." *Id.* at A-0491–92 (emphasis added).

#### b. Joint Motion to Dismiss

While PacifiCorp's motion for summary judgment was pending, the Commission issued the 2025 Order. *See* Vol. 11, A-1715–58. Accordingly, the Commission and WIEC filed a joint motion to dismiss, emphasizing that the rates established by the 2024 Order were no longer in effect. Vol. 10, A-1356. The *prospective* declaratory and injunctive relief PacifiCorp sought regarding the 2024 Order under the *Ex parte Young* doctrine was no longer available. *Id.* at A-1357.

The Commission and WIEC demonstrated the 2025 Order did not keep the controversy surrounding the 2024 Order alive and there was no longer an alleged ongoing violation of federal law. While the 2024 Order included the Aurora adjustment, PacifiCorp disavowed Aurora for setting the rates approved in 2025 Order. Vol. 10, A-1559.

Thus, PacifiCorp could no longer receive prospective relief from an ongoing violation of federal law. Vol. 10, A-1357.

#### c. Final Order

On September 10, 2025, the district court denied the Commission and WIEC's joint motion to dismiss and granted PacifiCorp's motion for summary judgment. Vol. 12, A-2060–72. The district court maintained jurisdiction by concluding that WIEC's adjustment "intruded on FERC's exclusive

jurisdiction," and stating that this "is the controversy that apparently survives the expiration of the 2024 Order." *Id.* at A-2067.

The district court then limited its preemption analysis to "statements appear[ing] on the face of the Commission's Order" and found that the "evidence" indicated that the "Commission prevented [PacifiCorp] from recovering its costs associated with the maintenance of third-party reserves on the theory that it was unfair for Wyoming customers to subsidize FERC-jurisdictional customers." *Id.* at A-2071. It discounted the fact that WIEC's "adjustment adheres more closely to FERC-approved costs than did [PacifiCorp's] estimate," because, in its view, "it is far from clear that this was the motivating factor behind the adjustment." *Id.*

The district court diminished WIEC's and the Commission's concerns regarding the errors and inaccuracies of Aurora and instead characterized the dispute in the following terms: "[T]he record indicates that WIEC and, by adoption, the Commission thought it unreasonable for [PacifiCorp] to seek to recover its costs incurred due to compliance with *FERC requirements*." *Id.* at A-2070 (emphasis added). The district court never identified *which* FERC requirements were at issue. Nonetheless, it concluded that there was "no genuine dispute of material fact" that the 2024 Order "is preempted by federal law." *Id.* at A-2071.

This appeal followed.

## SUMMARY OF ARGUMENT

The district court reversibly erred in three ways:

1. The district court should have dismissed PacifiCorp's complaint as moot.

Initially, the district court found *Ex parte Young* applied, noting that "*[s]o long as the [2024] Order is still in effect*, there is an alleged ongoing violation of federal law." Vol. 2, A-0401 (emphasis added). But the 2024 Order was superseded by the 2025 Order following a rate case that disavowed Aurora. Accordingly, it became impossible for the district court to afford prospective relief from an ongoing violation of federal law.

2. The district court inappropriately granted summary judgment by failing to identify any FERC order or mandate that preempts the Commission and ignoring several factual disputes demonstrating that what FERC did do could not preempt the Commission's adjustment.

Neither PacifiCorp nor the district court identified a FERC order preempting the adjustment—the reduction in forecast NPC derived from PacifiCorp's, not FERC's, flawed Aurora model. The district court erred in limiting its review to "the face of the Commission's Order," presuming the Commission's intent, and ignoring factual disputes demonstrating FERC has not preempted the Commission's adjustment.

3. The district court abused its discretion by declining to dismiss the case under the *Burford* abstention doctrine. Because no FERC rate or mandate preempts the Commission's adjustment, this case implicates a purely state ratemaking function.

## ARGUMENT

### I. The District Court Erred in Failing to Dismiss PacifiCorp's Claims as Moot

#### A. Standard of Review

This Court "review[s] mootness de novo as a legal question." *Keller Tank Servs. II v. Comm'r*, 854 F.3d 1178, 1193 (10th Cir. 2017). Any "findings of jurisdictional facts," however, are reviewed for clear error. *Baker v. USD 229 Blue Valley*, 979 F.3d 866, 871 (10th Cir. 2020). But where, as here, "no evidentiary hearing [is] held [and] the parties [do] not contest the facts …[,] the district court need[] only … resolve the legal question of mootness, not resolve disputed issues of fact relating to justiciability." *Brown v. Buhman*, 822 F.3d 1151, 1168 (10th Cir. 2016). Accordingly, a de novo standard of review applies. *Id.*

#### B. *Ex parte Young*, PacifiCorp's Requested Relief, and the District Court's Initial Order Denying Motions to Dismiss

"Because the jurisdiction of federal courts is limited, there is a presumption against … jurisdiction, and the party invoking federal jurisdiction bears the burden of proof." *Delgado v. Gonzales*, 428 F.3d 916, 919 (10th Cir.

2005) (quotation and citation omitted). The Eleventh Amendment removes subject matter jurisdiction and immunizes Wyoming state officers from suit in federal court. *Chamber of Com. of the U.S. v. Edmondson*, 594 F.3d 742, 760 (10th Cir. 2010). However, under *Ex parte Young*, "the Eleventh Amendment does not apply to suits against a state officer in his official capacity seeking only prospective relief." *Id.* at 760 (citing *Ex parte Young*, 209 U.S. 123, 159–60 (1908)). Under the *Ex parte Young* doctrine, PacifiCorp must show it is "(1) suing state officials rather than the state itself, (2) alleging an ongoing violation of federal law, and (3) seeking prospective relief." *Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1167 (10th Cir. 2012).

Here, PacifiCorp's complaint sought a declaration that the Commission's actions in the 2024 Order "*are* preempted by the FPA" and that the 2024 Order "*is* unenforceable." Vol. 1, A-0043 ¶A (emphasis added). PacifiCorp asked the district court to "reinstate the amount of the annual revenue requirement associated with the" Aurora adjustment. *Id.* at ¶B.

The Commission initially moved to dismiss on Eleventh Amendment immunity grounds. *Id.* at A-0052–57. In response, PacifiCorp confirmed it sought only "prospective relief as to an ongoing violation of federal law." *Id.* at A-0200. PacifiCorp's argument was predicated on the following: "Because PacifiCorp is required to charge … lower rates *so long as the Order is in effect*,

the Order's usurpation of FERC's jurisdiction has material, ongoing impacts to PacifiCorp and its customers." *Id.* at A-0202 (emphasis added).

The district court agreed, concluding "the ongoing enforcement of a state commission order that allegedly violates federal law is a sufficient form of prospective relief." Vol. 2, A-0400. Ultimately, the district court found *Ex parte Young* applied, noting that "*[s]o long as the Commission's Order is still in effect*, there is an alleged ongoing violation of federal law." *Id.* at A-0401 (emphasis added).

### C. PacifiCorp Abandoned Aurora for Setting Rates

Seven months after the 2024 Order, PacifiCorp filed the 2024 Rate Case without using Aurora to set base NPC. Vol. 10, A-1368.[7] Rather, PacifiCorp asked the Commission to maintain the base NPC established in the 2024 Order to mitigate customer rate impacts.[8] While alleging before the district court

---

[7] PacifiCorp's repeated assertions make this crystal clear. Vol. 10, A-1559 (PacifiCorp Senior Vice President stating base NPC "do[es] not rely on the Aurora model"); Vol. 12, A-1958–59 (PacifiCorp Director, Net Power Costs recommending that "all Aurora or NPC related issues unrelated to customer rates in this [general rate case] be addressed in a future filing, as they—and Aurora—do not impact this [rate case's] proposed NPC baseline."); *id.* at A-1962 (PacifiCorp's discovery response stating: "Due to the Company's proposed rate mitigation to hold the net power costs (NPC) at the level approved by the [2024 Order], the output of any Aurora model does not have any relevance on the base NPC proposed in this 2025 [General Rate Case] proceeding." (emphasis added)).

[8] Again, PacifiCorp was adamant. Vol. 10, A-1368 (noting proposal to maintain 2024 Order base NPC was to "mitigate" the "compounding of additional [rate]

that base NPC needed a $23.5 million increase, PacifiCorp told the Commission maintaining current NPC levels was "in the public interest and will result in just and reasonable rates." *Id.* at A-1377.

Ultimately, WIEC, the Office of Consumer Advocate, and PacifiCorp settled the 2024 Rate Case using PacifiCorp's proposed base NPC. *Id.* at A-1384. The settlement acknowledged that the Wyoming-allocated base NPC was the same amount the Commission approved in the Company's last general rate case, but the settlement does not specify a methodology used to derive that dollar amount. *Id.* Instead, PacifiCorp's executive testified that the proposed "settlement and ... base net power costs do not rely on the Aurora model" and that PacifiCorp would "continue to work with parties" on Aurora "or otherwise address a different way of setting the forecasts for base [NPC] in our next rate case." *Id.* at A-1559.

Based on PacifiCorp's representations, the Commission approved the settlement and established new rates, finding it "consistent with the public interest and results in just and reasonable rates." Vol. 11, A-1751 ¶201. The

---

increases"); *id.* at A-1493–94 (stating base NPC PacifiCorp stipulated to "was the base NPC recommended by [PacifiCorp] in this case to mitigate the rate impact"); Vol. 11, A-1727 ("The Company chose, however, to mitigate the effects of its forecast NPC by proposing base NPC at the level established in the 2023 [General Rate Case]."); Vol. 12, A-1944 ("The Company intentionally chose to hold its proposed NPC baseline constant to reduce the proposed rate increase in this case.").

2025 Order rates became "effective for service rendered on and after June 1, 2025." *Id.* at A-1756 ¶1. Thus, with PacifiCorp's stipulation and agreement, the 2025 Order superseded the 2024 Order.

### D. The District Court Erred in Maintaining Jurisdiction Following the 2025 Order

The district court erroneously concluded that PacifiCorp's claims for prospective relief from allegedly ongoing violations of federal law were not moot. When the 2025 Order became effective, it superseded the 2024 Order. The 2025 Order rendered PacifiCorp's requested relief—an order enjoining Commissioners from enforcing the 2024 Order rate and requiring the Commission to "reinstate the amount of the annual revenue requirement associated with the" Aurora adjustment—no longer available. Thus, the district court erred in failing to find the case moot.

#### 1. The District Court Improperly Concluded PacifiCorp's Claims Were Not Moot

Federal courts are courts of limited jurisdiction and their authority is confined to "deciding actual 'Cases' or 'Controversies.'" *Brown*, 822 F.3d at 1163. "[A] case becomes moot when a plaintiff no longer suffers actual injury that can be redressed by a favorable judicial decision." *Shields L. Grp., LLC v. Stueve Siegel Hanson LLP*, 95 F.4th 1251, 1280 (10th Cir. 2024) (quoting *Brown*, 822 F.3d at 1166). A moot case "places a dispute outside the reach of

the federal courts" and "deprives federal courts of [subject-matter] jurisdiction." *Brown*, 822 F.3d at 1164, 1165.

Here, the district court erred in maintaining jurisdiction because the 2025 Order precludes PacifiCorp from receiving (1) prospective relief from (2) an ongoing violation of federal law. *Pruitt*, 669 F.3d at 1167.

#### a. PacifiCorp Can No Longer Demonstrate an Ongoing Violation of Federal Law

Once the Commission issued the 2025 Order, the 2024 Order rates were no longer effective; the 2025 Order rates became effective. Vol. 11, A-1756 ¶1. PacifiCorp's complaint alleges that the 2024 Order makes unlawful adjustments to Aurora. Vol. 1, A-0035 ¶¶ 78–85. But as PacifiCorp's witness stated, the 2025 Order rates "do not rely on the Aurora model." Vol. 10, A-1559. Thus, the 2024 Order's alleged constitutional defect cannot infect the 2025 Order and the prospective rates coming from that order.[9]

Because the 2024 order is no longer effective, there is no ongoing violation of federal law that a court order would end, which is the *raison d'être* of *Ex parte Young*. *See Papasan v. Allain*, 478 U.S. 265, 277–78 (1986) (*Young*

---

[9] But even if the 2025 Order perpetuated constitutional defects, nothing in PacifiCorp's complaint alleges that the 2025 Order suffers from the same constitutional limitations as the 2024 Order. To the extent PacifiCorp believes that its new rates—which it stipulated to as just and reasonable—are constitutionally impermissible, that is a different lawsuit.

focuses on cases where "the relief against the state official directly ends the violation of federal law").

#### b. PacifiCorp Can No Longer Demonstrate It Seeks Only Prospective Relief

The district court's mootness analysis included two sentences on prospective relief. *First*: "Plaintiff continues to seek injunctive relief to force Defendants to refrain from adjusting their retail rates using allegedly preempted rationale in the future." Vol. 12, A-2067. Put differently, invalidating the 2024 Order will deter similar adjustments in the future. But deterrence does not establish prospective relief. *Green v. Mansour*, 474 U.S. 64, 68 (1985) ("[C]ompensatory or deterrence interests are insufficient to overcome the dictates of the Eleventh Amendment."). Further, in *Estate of Schultz v. Brown*, this Court concluded that relief from superseded administrative orders is not prospective in nature. 846 Fed. Appx. 689, 692 (10th Cir. 2021). This Court said: "the district court could not order Defendants 'to abide by the [first] order,' … as the complaint requests, without changing the past—it would have to nullify the second order and reinstate the first one." *Id.*

The same is true here. PacifiCorp seeks a declaration that the Commission's actions "*are* preempted by the FPA" and that the 2024 Order "*is* unenforceable." Vol. 1, A-0043 ¶A (emphases added). In PacifiCorp's response

to the Commission's initial motion to dismiss, PacifiCorp clarified "[t]he specific relief sought by PacifiCorp is a 'declaration and injunction ordering the Commissioners to *reverse their decision* requiring PacifiCorp to improperly lower its [R]evenue [R]equirement in association with' their improper method of accounting for the Third-Party Reserves." Vol. 1 A-0202–03 (emphasis added).

To "reverse" the 2024 Order or conclude the Commission's actions "are preempted" and that the 2024 Order "is unenforceable," the district court had to "nullify the second order and reinstate the first one." *Estate of Schultz*, 846 Fed. Appx. at 692. This "is precisely the type of retroactive equitable relief prohibited under the *Ex parte Young* doctrine." *Id.* (internal quotation, citation, and brackets omitted).

*Second*, the district court stated: "These parties will, annually, go through the process of negotiating rates for Wyoming consumers." Vol. 12, A-2067. This is unsupported, incorrect, and irrelevant. Base NPC is set in rate cases, and as the Commission and WIEC stated: "[N]o Wyoming law or Commission rule requires PacifiCorp to file a rate case at certain intervals or times. Rather, PacifiCorp chooses when to file rate cases at the Commission and what relief to include." Vol. 12, A-1917 (citing Wyo. Stat. § 37-3-106(c)).

Further, these cases are litigated, not negotiated.[10] *See generally* 023-0002-2 Wyo. Code R. §§ 5–31. And that PacifiCorp will file future applications with the Commission does not render its requested relief prospective. *ANR Pipeline Co. v. LaFaver*, 150 F.3d 1178, 1189 (10th Cir. 1998) (*Ex parte Young* "does not allow a federal court to declare past state conduct unconstitutional when the only purpose for such a declaratory judgment would be its res judicata effect in a subsequent state-court proceeding").

The only relief remaining is PacifiCorp's request to "reinstate" $23.5 million to a base NPC amount no longer in effect. Vol. 1, A-0043 ¶B. But requiring the Commission to increase PacifiCorp's revenue requirement after PacifiCorp has requested and been granted new rates, is the same as seeking damages for past action. Where, as here, "the requested relief is akin to a retrospective damages award, *Ex Parte Young* is inapplicable and the Eleventh Amendment prohibits the federal suit." *Tarrant Reg'l Water Dist. v. Sevenoaks*, 545 F.3d 906, 911 (10th Cir. 2008).

Because the 2025 Order superseded the 2024 Order there is no prospective relief sufficient for the district court to retain jurisdiction. The

---

[10] Similarly, while PacifiCorp's recovery of actual NPC is adjusted annually through the ECAM, such applications are also litigated proceedings, do not involve the establishment of base NPC, and do not use Aurora or any computer model.

district court's order should be reversed, and PacifiCorp's complaint should be dismissed.

### 2. The District Court Improperly Concluded the Alleged Conduct was Capable of Repetition Yet Evading Review

To survive mootness, the district court (erroneously) concluded that the "capable of repetition, yet evading review" exception applied. Vol. 12, A-2067–68. That exception requires (1) "the duration of the challenged action [be] too short to be fully litigated" and (2) the moot issues "[be] capable of repetition, such that there is a reasonable expectation that the same complaining party will be subjected to the same action again." *Robert v. Austin*, 72 F.4th 1160, 1164–65 (10th Cir. 2023). PacifiCorp "bears the burden of establishing *both* elements of this two-prong test." *Jordan v. Sosa*, 654 F.3d 1012, 1035 (10th Cir. 2011). The record before the district court does not meet these requirements.

#### a. This Action is not Inherently Short in Duration

To evade mootness, the action must be of an "inherently short duration" such that it "is likely forever to evade review." *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 481 (1990) (internal citation and quotation omitted). The district court found the case inherently short because "[e]ach order is in effect for one year." Vol. 12, A-2067. This is unsupported and incorrect.

"[N]o Wyoming law or Commission rule requires PacifiCorp to file a rate case at certain intervals or times. Rather, PacifiCorp chooses when to file rate cases at the Commission and what relief to include." Vol. 12, A-1917. PacifiCorp's 2023 Rate Case was filed three years after its previous case. *In re Rocky Mountain Power*, 2023 Wyo. PUC Lexis 64, Docket No. 20000-578-ER-20 (Record No. 15464) (WY P.S.C. Mar. 9, 2023). PacifiCorp chose to file a new rate case without relying on Aurora during the pending litigation—it was not required to do so. PacifiCorp cannot voluntarily file a new rate case and then seek to invoke an exception to mootness because its own actions mooted its pending litigation. *Cf., e.g.*, *Abdurrahman v. Dayton*, 903 F.3d 813, 817–18 (8th Cir. 2018) (listing instances when an action does not evade review because of a plaintiff's voluntary inaction).

#### b. The 2024 Order Outcome is not Reasonably Expected to Recur

The second element requires that there "be a 'reasonable expectation' or a 'demonstrated probability' that the same controversy will recur involving the same complaining party." *Murphy v. Hunt*, 455 U.S. 478, 482 (1982). "[A] mere physical or theoretical possibility" is not enough. *Id.* Supporting this element,

the district court stated, without elaboration, that "the issue regarding trapped costs will continue to rear its head." Vol. 12, A-2068.

The district court ignored PacifiCorp's actions and statements. PacifiCorp is not required to use Aurora. *See* Vol. 1, A-0098 ¶71. Indeed, PacifiCorp did not use Aurora to calculate the settled base NPC in the 2025 Order, which demonstrates that the alleged constitutional infirmity did not, in fact, recur. Further, at the settlement hearing that led to the 2025 Order, PacifiCorp stated while it would "continue to work with parties to make them comfortable with the Aurora model," if unsuccessful, PacifiCorp would "address a different way of setting the forecasts for base [NPC] in our next rate case." Vol. 10, A-1559. While PacifiCorp could "theoretically" use Aurora again, that outcome is anything but certain. That is not a "demonstrated probability" of recurrence.

Therefore, the district court erred in concluding that the capable of repetition, yet evading review exception applied. Rather, PacifiCorp's complaint should have been dismissed because PacifiCorp's alleged prospective relief from an ongoing violation of federal law was moot. *Pruitt*, 669 F.3d at 1167.

## II. The District Court Erred in Granting Summary Judgment

The district court did not engage with the legal elements of the filed rate doctrine; instead, it limited its review to "the face" of the 2024 Order. This

alone compels reversal. At a minimum, though, the district court ignored factual disputes demonstrating FERC did not preempt the Commission's adjustment.

### A. Standard of Review

This Court "review[s] a summary judgment order de novo, applying the same standards the district court would use in deciding whether to grant the motion." *Koel v. Citizens Med. Ctr., Inc.*, 128 F.4th 1329, 1333 (10th Cir. 2025). Summary judgment is appropriate only if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

"A dispute is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmoving party, and a fact is material when it might affect the outcome of the suit under the governing substantive law." *Obermeyer Hydro Accessories, Inc. v. CSI Calendaring, Inc*, 852 F.3d 1008, 1014 (10th Cir. 2017) (quotation omitted). Courts view the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *Id.*

### B. The District Court Committed Legal Error by Misapplying the Filed Rate Doctrine and Failing to Identify any FERC Order Preempting the Commission's Adjustment

Before state action can be preempted under the filed rate doctrine, FERC must first issue a mandate that the state subsequently ignores or contradicts.

Here, neither the district court nor PacifiCorp identified any FERC mandate preempting the Commission's adjustment. Thus, the district court failed to find this fundamental element in its filed rate doctrine analysis.

### 1. Components of FERC Jurisdiction and the Filed Rate Doctrine

Filed rate doctrine jurisprudence has developed in the context of FERC's jurisdiction over *wholesale* sales. *See Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 956–59 (1986) (FERC-approved allocation of wholesale power); *Miss. Power & Light Co. v. Mississippi*, 487 U.S. 354, 372–73 (1988) (same); *Entergy La., Inc. v. La. PSC*, 539 U.S. 39, 49–50 (2003) (FERC-approved wholesale system agreement); *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 165 (2016) (FERC-approved wholesale capacity cost).

FERC must set just and reasonable wholesale rates. 16 U.S.C. § 824d(a). When FERC exercises this duty, applying the filed rate doctrine is straightforward: "[W]hen setting retail rates, state regulators may not determine that *costs incurred* pursuant to a *FERC-filed rate* were unreasonable and set retail rates as if the full cost of wholesale energy had not been incurred." *PG&E v. Lynch*, 216 F. Supp. 2d 1016, 1035 (N.D. Cal. 2002) (first and second emphases added). Thus, the doctrine prohibits state regulators from adopting any rate other than the rate filed with FERC as a reasonably incurred wholesale cost. *Hughes*, 578 U.S. at 165.

In practice, FERC preemption occurs where a state-regulated utility purchases wholesale power under a FERC tariff, but the state regulator prohibits full recovery of that purchase in retail rates. *Hughes*, 578 U.S. at 164 ("In each of those cases, a State determined that FERC had failed to ensure the reasonableness of a wholesale rate, and the State therefore prevented a utility from recovering—through retail rates—the full cost of wholesale purchases."). Thus, the filed rate doctrine prohibits state agencies from "trapping" costs incurred pursuant to a "*FERC-approved* rate." *Nantahala*, 476 U.S. at 970 (emphasis added).

Accordingly, any successful filed rate doctrine claim requires a FERC mandate preempting state action. The point is simple but crucial: Before determining state action is preempted, courts must first identify an operative FERC decision setting a just and reasonable rate; only then can it consider whether state action impermissibly contradicts FERC's authority. The seminal cases PacifiCorp and the district court cited below illustrate this point.

In *Nantahala*, the Supreme Court considered a FERC order reallocating two affiliated companies' shares of low-cost power. *Nantahala*, 476 U.S. at 955–58; *see Nantahala Power & Light Co. Highlands v. Nantahala Power & Light Co.*, 19 FERC ¶ 61,152, 61279–80 (1982). Under their agreement, Nantahala, a public utility, received 20% of the Tennessee Valley Authority's ("TVA") low-cost power, while the other company, Tapoco, received 80%.

*Nantahala*, 476 U.S. at 956. FERC, however, determined this was unfair and ordered Nantahala to file a new wholesale rate schedule based on 22.5% entitlement. *Id.* at 958.

Despite FERC's order, the Utilities Commission of North Carolina ("NCUC') reexamined FERC's determination in a retail rate proceeding. *Id.* at 959–60. NCUC ordered Nantahala to calculate retail costs as though it received 24.5% of the low-cost power. *Id.* at 960–61. Consequently, Nantahala incurred wholesale power costs it could not recover through retail rates.

The Court determined NCUC's allocation "runs directly counter to FERC's order, and therefore cannot withstand the pre-emptive force of FERC's decision." *Id.* at 968. The Court held that "[o]nce FERC sets such a rate, a State may not conclude in setting retail rates that the FERC-approved wholesale rates are unreasonable." *Id.* at 966.

The Supreme Court faced a similar question in *Mississippi Power*. *See* 487 U.S. at 371. FERC required the Mississippi Power & Light Company ("MP&L") to purchase 33% of the Grand Gulf nuclear plant's high-cost power. *Id.* at 363. FERC affirmed that this allocation would "achieve just and reasonable results." *Id.* at 363; *see also Middle S. Energy*, 32 FERC ¶ 61,425, 61960 (1985).

The Mississippi Public Service Commission ("MPSC") granted MP&L a retail rate increase to cover required purchases, passing FERC-mandated

wholesale rates to retail consumers. *Mississippi Power*, 487 U.S. at 365–66. On appeal, however, the state court held the MPSC erred by granting the increase without first inquiring into the reasonableness of the rates. *Id.* at 366–67.

The Supreme Court reversed. *Id.* at 370. It emphasized "the FERC order allocating Grand Gulf power" precludes any reasonableness inquiry. *Id.* at 372. The Court observed that the "facts of this case and *Nantahala* are not distinguishable": "Both cases concern FERC orders adjusting in the interest of fairness voluntary allocations of power among related entities." *Id.* at 372. Based on FERC's order, the Court held "the Supremacy Clause compels the MPSC to permit MP&L to recover as a reasonable operating expense costs incurred as the result of paying a FERC-determined wholesale rate for FERC-mandated allocation of power." *Id.* at 373.

In *Hughes*, the Supreme Court similarly identified a FERC-approved wholesale rate with preemptive effect. 578 U.S. at 163. At issue was a regional transmission organization's ("RTO") capacity auction, which FERC approved "as the sole rate[-]setting mechanism for sales of capacity to [the RTO]." *Id.* Notwithstanding, Maryland guaranteed new power plants a set price for capacity. *Id.* at 158–59. This overrode the auction price established through FERC's approved process. *Id.* at 163. The Court explained that, by "adjusting

an interstate wholesale rate, Maryland's program invades FERC's regulatory turf." *Id.*

Accordingly, these cases demonstrate a commonsense requirement: for the filed rate doctrine to apply, FERC must issue an order establishing a just and reasonable rate.

### 2. The District Court Failed to Identify a FERC Order or Mandate

Here, unlike the Court in *Nantahala*, *Mississippi Power*, and *Hughes*, neither the district court nor PacifiCorp identified a FERC order preempting the Commission-adopted adjustment to base NPC. Yes, *Nantahala*, *Mississippi Power*, and *Hughes* each implicate the FPA's broad requirement that FERC rates be just and reasonable. 16 U.S.C. § 824d(a). However, these cases hinge not on this broad requirement, but rather on identifying FERC's proclamation of what that just and reasonable rate is. *Nantahala*, 476 U.S. at 971 ("FERC has determined that Nantahala's average cost of power obtained from TVA should be based on a particular allocation of entitlement power, and no other."); *Mississippi Power*, 487 U.S. at 372 ("FERC has determined that MP&L's cost of power obtained from Grand Gulf should be based on a particular allocation, and no other."); *Hughes*, 578 U.S. at 163 ("FERC has approved the [RTO] capacity auction as the sole rate[-]setting mechanism").

The district court merely stated that "the evidence here indicates that the Wyoming Commission prevented [PacifiCorp] from recovering its costs associated with the maintenance of third-party reserves." Vol. 12, A-2071. Crucially though, the district court never specified *what* costs FERC ordered PacifiCorp to incur or *what* reserve requirements FERC ordered PacifiCorp to hold. For federal courts to employ the filed rate doctrine, undefined reference to "costs" and "requirements" is insufficient. True, FERC (through NERC) requires utilities to hold generation in reserve for reliability purposes. *Supra* Statement of the Case, Section I.B.). But the district court (and PacifiCorp) only identified the broad requirement (*i.e.*, holding reserves); it never identified what "FERC has determined" regarding how that broad requirement applies to PacifiCorp.

In sum, the district court erred because it held the Commission-adopted adjustment was preempted without identifying a FERC order with preemptive force. *See Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 389 (2015) (filed rate doctrine was applicable to "challenge the reasonableness of any rates *expressly* approved by FERC") (emphasis added). As discussed below, had the district court correctly applied the filed rate doctrine, it could not have concluded FERC preempted the Commission's adjustment.

### C. The District Court Ignored Several Disputes of Material Fact Demonstrating that Preemption Does Not Apply

In its motion for summary judgment, PacifiCorp simultaneously advanced two theories for preemption, asserting the Commission-adopted adjustment contradicted (1) FERC-approved "rates," (Vol. 2, A-0480); and (2) a FERC-ordered "methodology." *Id.* at A-0481. Its Complaint sheds more light on these inconsistent theories.

PacifiCorp alleges the Commission's decision was preempted because it "second-guess[es] [PacifiCorp's] FERC *rates* by concluding that it must reapportion costs to prevent Wyoming subsidization of FERC customers." Vol. 1, A-0039 ¶85 (emphasis added). But PacifiCorp also alleges the Commission's order "directly conflict[s] with PacifiCorp's FERC-approved, cost-based *methodologies* for determining reserves rates." *Id.* at Vol. 1, A-0035–36 ¶79 (emphasis added); *see also id.* at A-0037 ¶81 ("[T]he Commission has created an entirely new methodology for calculating the value of reserves and that methodology is directly contrary to federal law and FERC precedent.").

Like the district court, PacifiCorp stops short of detailing how broad FERC "rate" and "methodology" requirements impose a specific mandate on the Commission's ability to determine the Wyoming-jurisdictional variable cost impact of holding reserves in retail rates. Based on PacifiCorp's allegations, a proper filed rate doctrine analysis in this context would have

analyzed whether the Aurora adjustment contradicted a purported FERC-approved rate *or* methodology. The district court failed to conduct either analysis.

The evidence presented highlighted several factual disputes regarding both theories. The district court erroneously ignored these disputes when it bypassed the requisite preemption analysis.

### 1. The District Court Did Not Identify a FERC-Approved Rate

Consider FERC's two distinct functions—wholesale versus transmission jurisdiction. *Supra* at Section I.B.; 16 U.S.C. § 824(b)(1). Regardless of which is examined, no FERC rate exists that the Commission prohibited PacifiCorp from recovering. Rather, any allegedly trapped costs stem from PacifiCorp's—not FERC's—disputed forecast of state-jurisdictional costs.

#### a. The 2024 Order Did Not Interfere with a Wholesale Rate

Through *Nantahala*, *Mississippi Power*, and *Hughes*, the Supreme Court teaches that preemption under the filed rate doctrine occurs on the *wholesale* side of the ledger. The facts of these cases look like this:




As shown, these cases contemplate a utility's wholesale energy purchases to serve retail customers and a state prohibiting recovery of those FERC-approved costs through retail rates.

Here, no FERC-approved wholesale power rate is implicated. PacifiCorp pointed to Schedules 3/3A, 5, and 6 (*i.e.*, Third-Party Reserves) as the purported "rates" underpinning its preemption claim. Vol. 2, A-0482; Vol. 1, A-0024–25 ¶¶38–40. However, Schedules 3/3A, 5, and 6 involve costs associated with PacifiCorp's OATT (squarely within FERC's *transmission* function), not wholesale power costs. Vol. 2, A-0507–08 ¶¶ 6–8. Thus,

PacifiCorp did not identify, and the district court did not find, a FERC-approved wholesale power rate.

#### b. The 2024 Order Did Not Interfere with a Transmission Rate

PacifiCorp's reliance on its FERC-approved transmission rates fares no better. While PacifiCorp incurs costs to provide Third-Party Reserves, only PacifiCorp's interstate transmission customers take service under, and pay for, Third-Party Reserves. Vol. 7, A-1201 ¶14. Neither PacifiCorp nor Wyoming retail customers are among those entities. *Id.*; *id.* at A-1203 ¶21. Indeed, it is impossible to assess OATT rates on bundled retail customers in Wyoming. *New York*, 535 U.S. at 27–28 (affirming FERC decision to not apply OATT to bundled retail service).

Put simply, PacifiCorp's Third-Party Reserve rates were projected to recover $12.2 million. Vol. 7, A-1227 ¶41. The 2024 Order did not prevent PacifiCorp from collecting this $12.2 million from OATT customers. This scenario looks like this:




Therefore, at minimum, it is disputed whether the Commission interfered with PacifiCorp's recovery of transmission rates.

### c. The Amount of Any Purported Trapped Costs Was Disputed

PacifiCorp's motion for summary judgment requested the district court "reinstate approximately $23.5 million in NPC that was removed consistent with the WIEC Adjustment[] and recalculate PacifiCorp's retail rates." Vol. 2, A-0503.

Because this $23.5 million was a value Aurora fabricated—rather than derived from a FERC rate—the amount was disputed below. *First*, PacifiCorp told the Commission the "true cost impact" of WIEC's adjustment was $17.24 million, not $23.5 million. Vol. 3, A-0648; *see also* Vol. 7, A-1217–18 ¶18.

*Second*, the Commission ultimately approved $304.1 million in base NPC—$5.4 million *higher* than PacifiCorp's $298.7 million conditional final request. Vol. 7, A-1226 ¶38. While PacifiCorp claimed $23.5 million in "trapped" costs, the 2024 Order approved $5.4 million more than PacifiCorp ultimately requested.

*Third*, through annual ECAM filings, PacifiCorp presents actual NPC for the prior calendar year. *Id.* at A-1229 ¶48; Vol. 9, A-1301, A-1304. PacifiCorp may then recover or return 80 percent of any actual cost differences. Vol. 7, A-1230 ¶52; Vol. 9, A-1305. This calculation uses actual energy costs incurred when the system holds NERC-required reserves and does not rely on Aurora or other modeled forecasts. Vol. 7, A-1229–30 ¶¶49–50. Thus, any "trapped" costs are recovered to a substantial degree. Vol. 6, A-1192–94.

The district court dismissed (or did not address at all) these facts. Vol. 12, A-2060–72. However, for preemption to exist, a court must identify whether and to what extent state regulators trapped FERC-mandated costs. *See, e.g.*, *Nantahala*, 476 U.S. at 958. While Appellants dispute the existence of any FERC-approved rate, there is, at minimum, a dispute regarding the

extent of any trapped costs. The district court erred by ignoring these disputes and concluding the "Commission prevented Plaintiff from recovering its costs" without quantifying how much. Vol. 12, A-2071.

### 2. 2024 Order Did Not Interfere with a FERC-Approved Methodology

Despite reference to Third-Party Reserve rates, the gravamen of PacifiCorp's grievance is methodological. PacifiCorp claims the Commission must include in Wyoming retail rates the variable cost impact of holding Third Party Reserves, *as forecast by PacifiCorp's Aurora model.*

However, this assertion depends on the predicate that Aurora correctly accounts for FERC-mandated Third-Party Reserves. PacifiCorp alleges this. Vol. 1, A-0026 ¶47 ("[T]o account for the federal requirement to hold reserves in actual operations, ... PacifiCorp's [Aurora] modeling *correctly* accounts for FERC-mandated reserves." (emphasis added)). This predicate is disputed and conclusively incorrect for two reasons.

*First*, FERC never used Aurora to set any PacifiCorp rate. In the context of setting rates for PacifiCorp, FERC has never seen Aurora, never approved Aurora, and never calculated Wyoming customer reserve service costs. *See* Vol. 7, A-1202 ¶18; *id.* at A-1203 ¶¶20-21. The Commission had every right—and duty—to examine whether Aurora accurately forecasted NPC. In doing so, the Commission concluded Aurora, as a whole and with regard to

forecasting the Wyoming-jurisdictional variable cost impact of holding reserves, was unreliable, which PacifiCorp cannot now contest. Vol. 1, A-0126 ¶204; *id.* at A-0128 ¶215. *Second*, the district court claimed the Commission failed to follow "FERC requirements," but it was PacifiCorp that asked Wyoming customers to pay for [redacted]% more reserves than PacifiCorp told FERC it needed.

**a. FERC Does Not Use Aurora, and the Commission Lawfully Concluded Aurora Was Unreliable**

This case involves determining the forecasted variable energy cost impact on holding reserves for the benefit of Wyoming customers. For this calculation, PacifiCorp did not rely on any FERC-approved tariff or methodology. Vol. 1, A-0098 ¶¶71–72; Vol. 5, A-1158. Rather, PacifiCorp used Aurora. Vol. 7, A-1224–25 ¶35. In PacifiCorp's Third-Party Reserve rate proceeding, PacifiCorp did not present Aurora to FERC, FERC never approved Aurora, and FERC never calculated Wyoming customer reserve service costs. *Id.* at A-1224 ¶34; *id.* at A-1202 ¶18; *id.* at A-1203 ¶ 20. PacifiCorp uses Aurora only at the state level to estimate forecasted state-jurisdictional NPC for retail rates. *Id.* at A-1224–25 ¶¶34–35; *id.* at A-1203 ¶20. Simply, FERC cannot override a state commission's rejection of a model FERC has never reviewed or approved.

Not only has FERC never approved Aurora, FERC did not use any specific methodology when setting PacifiCorp's Third-Party Reserve rates in FERC Docket No. ER21-1015-000. Vol. 2, A-0532–33; *see also* Vol. 1, A-0025 ¶41. In that case, PacifiCorp agreed to a settlement, stating: "PacifiCorp notes that the 2020 Settlement Agreement was negotiated *on a black box basis, rather than calculated based on specific cost-of-service data.*" Vol. 9, A-1237 (emphasis added). Without analysis, FERC noted "[n]o protests or adverse comments were filed," and, in April 2021, FERC accepted PacifiCorp's proposed black box settlement, stating "[t]his action does not constitute approval of any service, rate, charge, classification, or any rule, regulation, contract, or practice affecting such rate or service provided for in the filed documents…." Vol. 2, A-0532–33; *see also* 18 C.F.R. § 35.4. And in discovery, PacifiCorp admitted it "did not file 'methods' or ask FERC to 'approve' methods for calculating the costs of providing ancillary services." Vol. 9, A-1316. In essence, PacifiCorp sued claiming FERC's methodology preempted the Commission's decision but admitted that FERC never approved any methodology. The district court erred in ignoring these facts.

Since FERC never approved Aurora (or any method) for reserve rates, the Commission justifiably examined PacifiCorp's cost estimates to see if they were accurate and reasonable. But the Commission discovered Aurora wasn't designed for the job PacifiCorp was using it for. Aurora "is primarily a power

market model, and it was not designed specifically to simulate single-issue or single-utility closed system dispatch in the same way as [the GRID] model was." Vol. 7, A-1225 ¶36. Importantly, Aurora wasn't designed for Third-Party Reserves. Vol. 3, A-0832. PacifiCorp manipulated Aurora with significant modeling and out-of-model assumptions, techniques, and workarounds. Vol. 7, A-1207–08 ¶7; *id.* at A-1225 ¶36; Vol. 9, A-1269. WIEC found Aurora included several errors, including a $74.1 million reserve modeling error, which was unrelated to the reserves themselves. Vol. 7, A-1226 ¶40; Vol. 9, A-1272–73.

Based on modeling errors, the Commission held PacifiCorp "failed to demonstrate in accordance with its burden of proof that its use of Aurora, including material adjustments to NPC estimates throughout the course of the proceedings, was valid." Vol. 1, A-0126 ¶204. Particularly, the Commission found the model could not replicate PacifiCorp's calculations due to software updates, only PacifiCorp and WIEC's witness had access to the model, and the model produced inconsistent outcomes depending on the sequencing of model runs and the computer processor used. *Id.*; *id.* at A-0099 ¶74; Vol. 4, A-1087. Ultimately, the Commission concluded it did "not derive a great deal of confidence in the usefulness of the Aurora model for evaluating forecast NPC, as presented by [PacifiCorp] in this proceeding." Vol. 1, A-0126 ¶204.

PacifiCorp did not seek rehearing of or appeal the Commission's invalidity finding. Vol. 9, A-1322. PacifiCorp cannot now contest the

Commission's factual finding that Aurora was unreliable. *Univ. of Tenn. v. Elliott*, 478 U.S. 788, 799 (1986) ("[F]ederal courts must give [a state] agency's fact-finding the same preclusive effect to which it would be entitled in the State's courts."); *Sierra Club v. Two Elk Generation Partners, L.P.*, 646 F.3d 1258, 1266–70 (10th Cir. 2011) (applying *Elliott* to Wyoming administrative proceeding).

**b. PacifiCorp Violated FERC Dictates**

Because the Commission found Aurora unreliable, it adopted a different approach. Here's what it did:

1. Removed the MW PacifiCorp assumed for Third-Party Reserves from the faulty modeling.
2. Still required Wyoming customers to pay 100 percent of all fixed generation costs, including those used for Third-Party Reserves.
3. Let PacifiCorp keep the $12.2 million in expected Third-Party Reserve revenue normally credited to Wyoming customers.

Vol. 7, A-1227 ¶¶42–43. Thus, PacifiCorp received 100 percent of its fixed costs plus $12.2 million as proxy for the variable cost impact of holding reserves. *Id.* at ¶43.

But that's not all. While the district court concluded the Commission's adjustment prevented PacifiCorp from recovering "the costs of maintaining FERC-mandated third-party reserves," (Vol. 12, A-2069), the 2024 Order

allowed PacifiCorp to recover additional variable energy costs based on reserve requirements far exceeding those assumed at FERC. PacifiCorp stated FERC determined "terms and conditions associated with its maintenance of … Third-Party Reserves" in Docket No. ER21-1015-000. Vol. 2, A-0499. Those terms and conditions based Third-Party Reserve rates on 996.3 MW of reserves. Vol. 7, A-1202 ¶17; Vol. 9, A-1247–48, A-1249–50. Yet, PacifiCorp populated Aurora with [redacted] MW, creating far more costs. Vol. 8, A-1225 ¶37; *see id.* at A-1218 ¶19, A-1226 ¶39. The Commission's adjustment removed only 142 MW, leaving [redacted] MW—[redacted] MW *more* than FERC assumed. Thus, PacifiCorp sought to impose costs on Wyoming customers based on a level of reserves completely untethered from amounts used to establish the very FERC rates it argues preempt the Commission. This is underscored by PacifiCorp's 2025 IRP, published on March 31, 2025, which represented that PacifiCorp needed 1,085 MW of reserves, or [redacted] MW *less* than included in the challenged adjustment. *Id.* at A-1228 ¶46.

Despite the district court's *factual* conclusion that the Commission's adjustment prevented PacifiCorp from recovering "costs of maintaining FERC-mandated third-party reserves," (Vol. 12, A-2070), the record proves otherwise. The Commission authorized PacifiCorp to recover:

1. 100 percent of all fixed capacity costs;
2. $12.2 million extra as proxy for variable cost impacts; and

3. Variable costs based on [redacted] MW more reserves than FERC required.

The district court erred in ignoring these factual realities.

PacifiCorp promotes an absurdity: It presented a computer model ill-equipped for the task, fed it questionable assumptions, got results the Commission deemed unreliable, and then claimed that federal law requires the Commission accept PacifiCorp's model even though that model is not used to set any federal rate. Because FERC never approved a methodology for calculating the variable cost impact of holding reserves, much less PacifiCorp's manipulated Aurora model, the Commission lawfully examined Aurora and concluded it was unreliable. The district court could not have concluded "FERC requirements" preempted the Commission's Aurora adjustment when FERC has never seen or used Aurora or determined the Wyoming variable energy cost impact of holding reserves.

### 3. The District Court Erroneously Limited Its Analysis to the "Face of the Commission's Order"

Rather than parsing disputed facts underlying these theories, the district court looked only at "what appears on the face of the Commission's Order." Vol. 12, A-2071. The district court singled out the term "subsidize" from the 2024 Order without analyzing its meaning in the context of the 2023 Rate Case. In doing so, it evaded the core preemption inquiry and focused on

an extraneous consideration: the Commission's *perceived motivation* for adopting WIEC's adjustment. These errors created more unresolved factual disputes.

**a. The Subsidy Fallacy**

The district court stated "the evidence here indicates that the Wyoming Commission prevented [PacifiCorp] from recovering its costs associated with the maintenance of third-party reserves on the theory that it was unfair for Wyoming customers to *subsidize* FERC-jurisdictional customers." Vol. 12, A-2071 (emphasis added). But whether this was, in fact, the Commission's "theory" is disputed.

*First*, while the district court cited (in its background discussion) the 2024 Order's statement that the adjustment was "needed to revalue third-party reserves in NPC in the same manner that FERC values them," (*id.* at A-2062–63), it ignored this lawful theory in its analysis. *Second*, the Commission's mention of the word "subsid[y]" merely underscores that PacifiCorp's flawed Aurora model inflated reserve requirements well beyond FERC requirements. *See* Vol. 7, A-1212 ¶13 (noting reserves in Aurora were "far in excess" of those "assumed when FERC set PacifiCorp's ancillary service rates"). Viewed in the light most favorable to the Commission, its "theory" was that retail customers should not subsidize overestimated variable costs based on a faulty model and reserve assumptions exceeding any level FERC used.

For this reason, "including costs in NPC that exceed the level of revenues being collected from non-native loads and resources is not reasonable." Vol. 3, A-0832.

Accordingly, the Commission did what the district court conceded was permissible—"find that the Aurora model overestimated [PacifiCorp's] costs associated with maintaining third-party reserves and adjust ... estimated NPC accordingly." Vol. 12, A-2071. But by looking only at the order's face, the district court presumed the Commission interfered with a FERC mandate, ignoring factual disputes and inverting the presumption against preemption. *Cf. New York*, 535 U.S. at 17–18 (presumption *against* preemption applied when "controversy concern[s] ... whether a given state authority conflicts with, and thus has been displaced by, the existence of Federal Government authority").

**b. The Motivating Factor Dispute**

Next, the district court discounted that the "adjustment adheres more closely to FERC-approved costs than did [PacifiCorp's] estimate," because "it is far from clear that this was the *motivating factor* behind the adjustment." Vol. 12, A-2071 (emphasis added). This statement departs from preemption jurisprudence and highlights factual disputes.

*First*, none of the Supreme Court cases above base preemption findings on state agencies' *perceived motivation*. And the district court cites no

authority for its unprecedented reliance on its subjective interpretation of the Commission's intent. On the contrary, courts analyze what the state did and whether actual conflict exists. *See Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 884 (2000) ("[C]onflict pre-emption is different in that it turns on the identification of 'actual conflict,' and not on an express statement of pre-emptive intent."); *Bldg. Indus. Elec. Contrs. Ass'n ex rel. United Elec. Contrs. Ass'n v. City of New York*, 678 F.3d 184, 191 (2d Cir. 2012) ("We will not search for an impermissible motive where a permissible purpose is apparent."); *Johnson v. Rancho Santiago Cmty. College Dist.*, 623 F.3d 1011, 1026 (9th Cir. 2010); *N. Ill. Chapter of Assoc. Builders & Contrs., Inc. v. Lavin*, 431 F.3d 1004, 1007 (7th Cir. 2005).

*Second*, even under a motivating factor test, were such a test appropriate, the record shows factual disputes about the motivation underlying the adjustment. The Commission explained the adjustment's principle: "[T]he Aurora model's calculations were unreliable and overstated." Vol. 5, A-1149 ¶6. Thus, "the adjustment WIEC proposed, and the Commission adopted, adjusted the net power cost forecast to include third-party reserve costs, *consistent with the rate FERC authorized PacifiCorp to charge* its FERC-jurisdictional customers for providing those services." *Id.* (emphasis added); Vol. 1, A-0126 ¶204.

The adjustment wasn't mere "dissatisf[action] with the allocation of costs between in-state customers and other customers," (Vol. 12, A-2071), but ensured Wyoming retail customers do not overpay for Third-Party Reserves due to Aurora's errors. Vol. 3, A-0832. After all, FERC never ordered Wyoming to bear PacifiCorp's costs for holding Third-Party Reserves to serve *FERC-jurisdictional* customers. This explains WIEC's expert testimony that if PacifiCorp's "FERC-approved OATT rates are inadequate" it should "seek to recover the funds through its FERC rates." *Id.*

*Finally*, the district court's very language—"it is *far from clear* that this was the motivating factor," (Vol. 12, A-2071 (emphasis added))—itself reveals factual disputes. By merely glancing at the 2024 Order's face, the district court couldn't resolve this lack of clarity. By giving the factual record such short shrift, the district court impermissibly presumed preemption. *See New York*, 535 U.S. at 17–18.

## III. The District Court Erred in Failing to Dismiss Under the *Burford* Abstention Doctrine

### A. Standard of Review

A district court's decision to abstain under *Burford* is reviewed for abuse of discretion. *Marshall v. El Paso Natural Gas Co.*, 874 F.2d 1373, 1377 (10th Cir. 1989). A court abuses its discretion when its decision "is arbitrary,

capricious, whimsical, or manifestly unreasonable." *United States v. Durham*, 902 F.3d 1180, 1236 (10th Cir. 2018).

### B. This Case Implicates a Purely State Retail Ratemaking Function

The district court believed PacifiCorp raised a cognizable preemption claim, declining *Burford* abstention because WIEC and the Commission allegedly "disregarded mandates required by a federal commission." Vol. 2, A-0417. Thus, it retained jurisdiction to inquire "whether the Commission directly or indirectly violated matters within FERC's exclusive jurisdiction." *Id.* at A-0420.

The district court rejected Appellants' assertions that this case is intertwined with state law claims, which require review of the entire administrative record. Vol. 1, A-0061; *id.* at A-0194; Vol. 2, A-0418. It ignored that "there is no FERC allocation of power" in this case and that PacifiCorp's "requested relief is ... crafted under the guise of federal law as an end-run around its failure to present accurate or reliable modeling before the Commission." Vol. 1, A-0189, A-0194.

As demonstrated in the foregoing sections, the district court erred. This case presents no preemption issue. There is no FERC order or mandate, and PacifiCorp—not FERC—used an error-prone Aurora model. When the Commission refused to blindly adopt PacifiCorp's manipulated Aurora

forecast, PacifiCorp flipped the script and claimed that FERC, not Aurora, required the inflated reserve requirements.

At base, this case involves the Commission's purely state retail ratemaking function. The Commission did not invade FERC's jurisdiction because FERC does not calculate reserve costs for retail customers. Without preemptive FERC orders, the filed rate doctrine is inapplicable. Accordingly, the district court abused its discretion by failing to abstain under *Burford*.

## CONCLUSION

The Commission and WIEC urge the Court to:

1) Reverse and dismiss this case because it is moot; and/or

2) Reverse and dismiss this case because no FERC order or mandate exists that preempts the Commission's adjustment; and/or

3) Reverse and remand for resolution of factual disputes; and/or

4) Reverse and dismiss pursuant to *Burford* abstention.

## STATEMENT CONCERNING ORAL ARGUMENT

The Commission and WIEC respectfully request oral argument. This is a complex appeal involving multiple issues, including important constitutional issues, and a judgment with significant implications for Wyoming energy consumers. Oral argument may assist the Court in comprehending the issues presented.

Dated: January 22, 2026.

Respectfully submitted,

*/s/James Peters*
James Peters
Wyoming Attorney General's Office
109 State Capitol
Cheyenne, WY 82002
James.peters@wyo.gov

*Attorney for Appellants Christopher Boswell, Christopher B. Petrie, and Michael M. Robinson, in their official capacities as Commissioners of the Public Service Commission of Wyoming*

*/s/Kristina (Tina) Van Bockern*
Kristina (Tina) Van Bockern
Austin W. Jensen
HOLLAND & HART LLP
555 Seventeenth Street, Suite 3200
Denver, CO 80202
Ph. 303-295-8000
trvanbockern@hollandhart.com
awjensen@hollandhart.com

*Attorneys for Petitioner Wyoming Industrial Energy Consumers*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this document complies with the format and word limit of Fed. R. App. P. 32(a)(7)(B), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and Fed. R. App. P. 32(g), this document contains 12,921 words. This document also complies with the typeface and style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 13-point font.

All required privacy redactions have been made to this document. This document has been scanned for viruses using Windows Defenders Antivirus Client, which runs real time virus scans, is updated every eight hours, and accordingly, is free of viruses.

Dated: January 22, 2026

*/s/Kristina (Tina) Van Bockern*
Kristina (Tina) Van Bockern

## CERTIFICATE OF SUBMISSION OF HARD COPIES OF PLEADINGS

I hereby certify that the seven (7) hard copies of this pleading required to be submitted to the clerk's office will be exact copies of this ECF filing.

Dated: January 22, 2026

*/s/Kristina (Tina) Van Bockern*
Kristina (Tina) Van Bockern

## CERTIFICATE OF SERVICE

I hereby certify, pursuant to Fed. R. App. P. 25(c), that the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will send a notification to the attorneys of record in this matter, who are registered with the Court's CM/ECF system.

Dated: January 22, 2026

*/s/Kristina (Tina) Van Bockern*
Kristina (Tina) Van Bockern

# ATTACHMENTS

# Attachment 1

# Order Denying Commission's and WIEC's Motion to Dismiss, ECF No. 47 (Oct. 1, 2024)

FILED

UNITED STATES DISTRICT COURT DISTRICT OF WYOMING

9:52 am, 10/1/24

Margaret Botkins
Clerk of Court

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

---

PACIFICORP, d/b/a Rocky Mountain Power, an Oregon corporation,

Plaintiff,

vs.

MARY A. THRONE, CHRISTOPHER B. PETRIE, and MICHAEL M. ROBINSON, in their official capacities as Commissioners of the Public Service Commission of Wyoming,

Defendants,

vs.

WYOMING INDUSTRIAL ENERGY CONSUMERS,

Intervenor Defendant.

Case No. 24-CV-101-KHR

---

**ORDER DENYING DEFENDANTS' MOTION TO DISMISS [30] AND INTERVENOR DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO STAY [37]**

---

Before the Court is Defendants' Motion to Dismiss [ECF No. 30] and Intervenor Defendant Wyoming Industrial Energy Consumers' Motion to Dismiss or, in the Alternative, To Stay. [ECF No. 37]. Defendants move to dismiss Plaintiff's claims based on lack of subject matter jurisdiction under Rule 12(b)(1). Specifically, Defendants request the Court dismiss the 42 U.S.C. § 1983 claim because it is barred under the Eleventh

Amendment, and the Court should decline to exercise jurisdiction over the remaining claims based on the *Burford* abstention doctrine. Intervenor Defendant moves to dismiss all of Plaintiff's claims for lack of subject matter jurisdiction under Rule 12(b)(1) because its claims fall within the purview of the Johnson Act. It also requests the Court abstain under the *Burford* doctrine. Alternatively, both parties request the Court stay proceedings until the State court adjudicates a pending case between the parties. After carefully reviewing the parties' briefings and exhibits, the Court DENIES both Motions.

## BACKGROUND

### I. Underlying Facts

All of the following facts are taken from the Plaintiff's Complaint.[1] *See* [ECF No.1]. Plaintiff is a public utility company that provides electricity throughout several states, including Wyoming. *Id.* at 4, ¶ 11. Plaintiff serves retail customers in Wyoming and transmits and sells electricity at wholesale in interstate commerce. *Id.* at 4–5, ¶¶ 11, 13. Additionally, Plaintiff provides transmission service in interstate commerce. *Id.* Defendants are the sole three commissioners of the Public Service Commission of Wyoming ("Commission"). *Id.* at 3, ¶ 5.

Under Wyoming law, the Commission has "general and exclusive power to regulate and supervise every public utility within the state." Wyo. Stat. Ann. § 37-2-112. Because Plaintiff is a public utility operating in Wyoming, it is subject to the Commission's regulatory and supervisory power. [ECF No. 1, at 4, ¶ 12]. Additionally, because Plaintiff

[1] The following recitation in this section is not to be construed as conclusions of facts or law.

transmits electricity and sells electricity at wholesale in interstate commerce, it is also subject to the Federal Energy Regulatory Commission ("FERC") and applicable federal law. *Id.* at 5, ¶¶ 13–14. Federal law generally allows state utility commissions, like the Commission, to regulate retail rates and electric service over local distribution facilities. *Id.* at 6, ¶ 19. However, FERC "exclusively regulates" wholesale electricity sales and transmission service over interstate power grids. *Id.* at 6, ¶ 20. FERC also requires Plaintiff to maintain electric generating capacity in reserves. *Id.* at 9–12, ¶¶ 31–41.

On March 1, 2023, Plaintiff applied to the Commission for permission to increase the retail rates due to an increase in service costs. *Id.* at 12, ¶ 42. In determining the appropriate retail rate, the Commission determines a utility's revenue requirement. *Id.* at 6–7, ¶ 22. When this occurs, utilities may provide testimony to support their applications, and interested third parties may likewise weigh in. *Id.* at 14, ¶ 49. Intervenor Defendant Wyoming Industrial Energy Consumers ("WIEC"), an interested third party, proposed a ratemaking theory that Plaintiff claims ignored the FERC-required reserves. *Id.* at 16, ¶ 53.

On January 2, 2024, the Commission issued a Memorandum Opinion, Findings and Order ("Order"), which allegedly approved and adopted WIEC's ratemaking theory. *Id.* at 17, ¶¶ 55–56. This resulted in a rate increase of roughly $53.9 million. *Id.* Plaintiff contends the Order violates certain matters within FERC's exclusive jurisdiction and reserve requirements, which will result in a $23.5 million loss in revenue. *Id.* at 17–18, ¶ 58.

On May 16, 2024, Plaintiff filed a Complaint seeking injunctive and declaratory relief. It asserts: (1) the Order is preempted by the Federal Power Act, 16 U.S.C. §§ 791 through 825r; (2) the Commission's decision violated the dormant commerce clause; and

(3) the Commissioners are liable under 42 U.S.C. § 1983 for the alleged violation of Plaintiff's constitutional rights. *See id.* at 18–30, ¶¶ 62–97.

## II. Defendants' Motion to Dismiss

On July 12, 2024, Defendants filed their Motion to Dismiss [ECF No. 30] and an accompanying Brief in Support thereof. [ECF No. 31]. Defendants argue that Plaintiff's claims are barred by the Eleventh Amendment. [ECF No. 31, at 4]. They also request the Court abstain from ruling on its remaining claims under the *Buford* doctrine. *Id.* at 18. Alternatively, Defendants request the Court stay these claims until the State court proceedings have been adjudicated. *Id.*

## III. Intervenor's Motion to Dismiss

On July 22, 2024, WIEC filed a Motion to Dismiss or, in the Alternative, to Stay [ECF No. 37] and its Memorandum of Law in Support thereof [ECF No. 38]. WIEC argues that the Court's subject matter jurisdiction is precluded by the Johnson Act, codified at 28 U.S.C. § 1342. [ECF No. 38, at 3]. Alternatively, WIEC also requests the Court abstain pursuant to the *Burford* doctrine, or stay proceedings until resolution of the State court proceedings. *Id.*

## RELEVANT LAW

Federal courts are courts of limited jurisdiction and may only hear cases when authorized by the Constitution and by an act of Congress. *Gad v. Kan. State Univ.*, 787 F.3d 1032, 1035 (10th Cir. 2015). To challenge jurisdiction, Fed. R. Civ. P. 12(b)(1) allows a party to move to dismiss a case for lack of subject matter jurisdiction at any stage in

litigation. The burden moves to the party asserting jurisdiction to prove it exists. *Lindstrom v. United States*, 510 F.3d 1191, 1193 (10th Cir. 2007).

Motions to dismiss for lack of subject matter jurisdiction may take two forms, either a facial or factual attack. *See Ruiz v. McDonnell*, 299 F.3d 1173, 1180 (10th Cir. 2002). A facial attack occurs when the motion challenges "the sufficiency of the complaint's allegations as to subject matter jurisdiction," whereas a factual attack is "a challenge to the actual facts upon which subject matter jurisdiction is based." *Id.* When a motion to dismiss is a facial attack, the court construes all factual allegations in the complaint as true. *Baker v. USD 229 Blue Valley*, 979 F.3d 866, 872 (10th Cir. 2020). If it is a factual attack, district courts have wide discretion to consider affidavits, other documents, and conduct a limited evidentiary hearing to resolve disputed jurisdictional facts. *Id.*

Dismissal for lack of subject matter jurisdiction is reviewed de novo. *High Country Citizens All. v. Clarke*, 454 F.3d 1177, 1180 (10th Cir. 2006). However, any findings of jurisdictional facts are reviewed for clear error. *Baker*, 979 F.3d at 871. Clear error presents itself when the reviewing court is left with a definite and firm conviction that a mistake was committed after looking at all the evidence in the record. *Ingram v. Faruque*, 728 F.3d 1239, 1243 (10th Cir. 2013). In doing so, the evidence is viewed in light most favorable to the district court's ruling. *Id.* When the jurisdictional fact ruling is plausible in consideration of the whole record, the reviewing court may not reverse. *Id.*

## RULING OF THE COURT

As set forth in more detail below, the Court denies Defendants' Motion to Dismiss and Intervenor Defendant's Motion to Dismiss, or, in the Alternative, To Stay. Each issue will be addressed in turn.

### I. Defendants Are Not Immune Under the Eleventh Amendment

Defendants contends that Plaintiff's 42 U.S.C. § 1983 claim is barred by the Eleventh Amendment, which would deprive the Court of subject matter jurisdiction. [*See* ECF No. 31, at 4–9]. Plaintiff argues that the *Ex parte Young* exception prevents Defendants from invoking Eleventh Amendment immunity, and the suit should proceed. [*See* ECF No. 41, at 7–10]. In addressing the elements of a valid *Ex parte Young*, Defendants concede Plaintiff meets the first two requirements but contend Plaintiff is seeking retroactive relief instead of prospective relief. [ECF No. 31, at 6–7]. While Defendants acknowledge that Plaintiff's request for relief is characterized as prospective, they argue that the relief is a request for retroactive relief in substance since it concerns Defendants' past actions, namely invalidating the Order. *Id.* at 8. Plaintiff responds that the requested relief is properly characterized as prospective because it seeks to prevent future enforcement of the Order. [ECF No. 41, at 10–11].

Generally, the Eleventh Amendment prohibits a citizen from filing suit against a state in federal court. *See* U.S. Const. amend. XI. The Eleventh Amendment likewise applies to entities or individuals that are "arms of the state." *E.g.*, *Couser v. Gay*, 959 F.3d 1018, 1022 (10th Cir. 2020). If properly invoked, the Eleventh Amendment deprives federal courts from subject matter jurisdiction over the claim against the state. *Fent v. Okla.*

*Water Res. Bd.*, 235 F.3d 553, 559 (10th Cir. 2000) ("[O]nce effectively asserted [Eleventh Amendment] immunity constitutes a bar to the exercise of federal subject matter jurisdiction."). Thus, a Rule 12(b)(1) motion to dismiss is a proper mechanism to challenge a federal court's jurisdiction under the Eleventh Amendment, and the court's ruling is reviewed de novo. *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1268 (10th Cir. 2005).

However, the Eleventh Amendment state sovereign immunity is not absolute, *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 304 (1990), and courts recognize three exceptions. *Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1166 (10th Cir. 2012). First, a state may consent or waive immunity to be sued in federal court. See *Hans v. Louisiana*, 134 U.S. 1, 13 (1890). Second, Congress may abrogate state sovereign immunity when it expressly intends to do so and acts pursuant to a valid exercise of power. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 55 (1996). Third, under the *Ex parte Young* doctrine, "a plaintiff may sue individual state officers acting in their official capacities if the complaint alleges an ongoing violation of federal law and the plaintiff seeks only prospective relief." *Hendrickson v. AFSCME Council 18*, 992 F.3d 950, 965 (10th Cir. 2021) (citing E*x parte Young*, 209 U.S. 123, 159–60 (1908)).

Under the third exception, the *Ex parte Young* doctrine "has been accepted as necessary to permit the federal courts to vindicate federal rights and hold state officials responsible to 'the supreme authority of the United States.'" *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 105 (1984) (quoting *Ex parte Young*, 209 U.S. 123, 160 (1908)). In order to properly invoke the *Ex parte Young* doctrine, "plaintiffs must show that they are: (1) suing state officials rather than the state itself, (2) alleging an ongoing

violation of federal law, and (3) seeking prospective relief." *Muscogee (Creek) Nation*, 669 F.3d at 1167. Under the third prong, *Ex parte Young* only affords "declaratory and injunctive relief rather than monetary damages for alleged violations of federal law." *Hill v. Kemp*, 478 F.3d 1236, 1255 (2007). "The fact that prospective relief could have financial consequences does not give rise to immunity, but when the requested relief is akin to a retrospective damages award, *Ex Parte Young* is inapplicable and the Eleventh Amendment prohibits the federal suit." *Tarrant Reg'l Water Dist. v. Sevenoaks*, 545 F.3d 906, 911 (10th Cir. 2008). Thus, formulaic recitations to meet *Ex parte Young*'s requirements are insufficient, as the substance of the claims must be prospective and equitable. *Hill*, 478 F.3d at 1259. "[A] court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (alteration in original) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997) (O'Connor, J. concurring in part)).

In *Verizon Maryland, Inc.*, the U.S. Supreme Court held that a "prayer for injunctive relief—that state officials be restrained from enforcing an order in contravention of controlling federal law—clearly satisfie[d their] 'straightforward inquiry.'" 535 U.S. at 645. Additionally, courts have generally held the ongoing enforcement of a state commission order that allegedly violates federal law is a sufficient form of prospective relief. *Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 523 (7th Cir. 2021) ("[T]he 'continued enforceability' of an unlawful state-agency decision can amount to an ongoing violation of federal law."); *MCI Telecomms. Corp. v. Ill. Bell Tel. Co.*, 222 F.3d 323, 345

(7th Cir. 2000) (holding that the ongoing enforcement of state agency determination is sufficient for the prospective relief inquiry); *Town of Barnstable v. O'Connor*, 786 F.3d 130, 140–41 (1st Cir. 2015) (holding a public utility commission's order that "occurred in the past … does not itself push the complaint outside the confines of the *Ex parte Young* doctrine" and reversing the district court's determination that the plaintiff's claims were retroactive because the plaintiff alleged ongoing enforcement of federal law).

The Court finds that Plaintiff has sufficiently alleged an ongoing violation of federal law and prospective relief. Looking at the Complaint, Plaintiff properly seeks declaratory and injunctive relief for the Commission's Order. [ECF No. 1, at 29, ¶ 94]. Furthermore, Plaintiff alleges ongoing violations of federal law multiple times throughout the Complaint and that it will be irreparably harmed by the Commission's enforcement of the Order. *Id.* at 26, 28, 30, ¶¶ 86, 92, 97. So long as the Commission's Order is still in effect, there is an alleged ongoing violation of federal law. *See Driftless Area Land Conservancy*, 16 F.4th at 523. Because Plaintiff alleges an ongoing violation of federal law and harm through enforcement of the Order, Plaintiff satisfies the Court's "straightforward inquiry." *Verizon Md., Inc.*, 535 U.S. at 645.

Defendants argue that Plaintiff's requests solely relate the Commission's past actions, [ECF No. 31, at 8–9], because Plaintiff's Prayer for Relief seeks, among other requests, a reversal of the Commission's Order and other past actions. [ECF No. 1, at 29, ¶ 95]. The Court agrees that Plaintiff's prayer seeks a declaration of past ineffectiveness of the Commission's Order. However, this fact does not defeat Plaintiff's claims because Plaintiff also alleges ongoing violations of federal law. *See Verizon Md., Inc.*, 535 U.S. at

646 (explaining that the plaintiff's prayer for declaratory relief for "past, as well as the future, ineffectiveness" of a state commission's action is not barred by the Eleventh Amendment); *MCI Telecomms. Corp.*, 222 F.3d at 345 (rejecting state utility commissioners' arguments that "if any violations occurred, they occurred in the past"). Because the Commission is enforcing the Order, Plaintiff alleges the Order will continually violate federal law which is sufficient for the Court's inquiry at this juncture.

Defendant uses *S&M Brands, Inc. v. Cooper*, 527 F.3d 500 (6th Cir. 2008) to support its contention that Plaintiff's request is retroactive in substance. [ECF No. 31, at 7–8]. In that case, the court held that the plaintiffs' request for refunds, which a state official issued in accordance with an amended statutory scheme instead of the prior scheme, was not prospective relief. *S&M Brands, Inc.*, 527 F.3d at 509. The Sixth Circuit reasoned that this was a one-time decision and would unlikely recur absent another amendment by the state legislature. *Id.* It contrasted the facts before it with *Verizon, Maryland, Inc.* by stating that "the substance of their claim is completely focused on the past—a *past* decision of the [state official] on *past* sales of cigarettes which had an impermissible retroactive *(past)* effect." *Id.* at 511 (emphasis in original).

However, this case is not instructive here because the plaintiffs in that case did not allege an ongoing violation of federal law. *Id.* at 510 ("The alleged constitutional deficiency here is a one-time, past event; the Plaintiffs do not seek a prospective injunction that requires the [state official] to conform his conduct in an ongoing, continuous fashion."). Here, as stated, Plaintiff does allege an ongoing violation of federal law and harm it will face through the Commission's enforcement of the Order. [ECF No. 1, at 26, 28, 30, ¶¶ 86,

92, 97]. Also, it appears that the Sixth Circuit took particular issue with the fact that retroactive money damages, in the form of a one-time payment, was the primary thrust of the plaintiffs' suit. *S&M Brands, Inc.*, 527 F.3d at 510. The court contrasted that circumstance with its decision in *Rossborough Mfg. Co. v. Trimble*, 301 F.3d 482 (6th Cir. 2002) that allowed a suit to proceed under *Ex parte Young* where the claimants were challenging the ongoing administration of funds. Plaintiff's claims in this case are more akin to *Rossborough Mfg. Co.* because the lower retail rates are allegedly charged on an ongoing basis. [ECF No. 1, at 26, 28, 30, ¶¶ 86, 92, 97]. Thus, it would appear the *S&M Brands, Inc.* court would likely allow the suit to proceed in this case, as well.

Further, unlike *S&M Brands, Inc.*, the Order will allegedly affect Plaintiff's future lost profits, as Plaintiff must continually charge lower retail rates. *Id.* at 17–18, ¶ 58. The Order by its own terms is still in effect and will continue to allegedly ignore matters within FERC's exclusive purview. *Id.* Such allegations coupled with Plaintiff's requests for injunctive and declaratory relief are sufficient to allege prospective relief.

Last, Defendants raise in their Reply that "[i]nvalidating or the voiding of a final state agency order—is quintessentially retrospective and thus out of bounds under *Young*." [ECF No. 42, at 2] (internal quotations omitted) (quoting *Green Valley Special Util. Dist. v. City of Schertz*, 969 F.3d 460, 471 (5th Cir. 2020)). However, this case likewise does not help Defendants' argument, as the court explains two sentences later that "[b]ecause at least one form of prospective relief is possibly available to [the plaintiff], its claims against the [state officials] are not barred by the Eleventh Amendment." *Green Valley Special Util.*

*Dist. v. City of Schertz*, 969 F.3d 460, 471 (5th Cir. 2020). As set forth above, there is at least one form of prospective relief possibly available to Plaintiff.

In sum, the U.S. Supreme Court has historically "approved injunction suits against state regulatory commissioners" in the context of *Ex parte Young*. *Verizon Md., Inc.*, 535 U.S. at 645 (citing *Prentis v. Atl. Coast Line Co*., 211 U.S. 210, 230 (1908); *Ala. Pub. Serv. Comm'n v. S. R. Co*., 341 U.S. 341, 344 n.4 (1951); *McNeill v. S. R. Co*., 202 U.S. 543 (1906); *Smyth v. Ames*, 169 U.S. 466 (1898); *Reagan v. Farmers' Loan & Tr. Co.*, 154 U.S. 362 (1894)). Plaintiff's request for past and future ineffectiveness of the Commission's Order satisfies the straightforward inquiry outlined in *Verizon, Maryland, Inc.* Therefore, Plaintiff's claims are not barred by the Eleventh Amendment and can proceed under the *Ex parte Young* doctrine.

## II. The Johnson Act Does Not Divest the Court's Jurisdiction

The Johnson Act provides that:

> The district courts shall not enjoin, suspend or restrain the operation of, or compliance with, any order affecting rates chargeable by a public utility and made by a State administrative agency or a rate-making body of a State political subdivision, where:
>
> (1) Jurisdiction is based solely on diversity of citizenship or repugnance of the order to the Federal Constitution; and,
> (2) The order does not interfere with interstate commerce; and,
> (3) The order has been made after reasonable notice and hearing; and,
> (4) A plain, speedy and efficient remedy may be had in the courts of such State.

28 U.S.C. § 1342. It is "intended to keep constitutional challenges to state orders affecting rates out of the federal courts 'lock, stock and barrel,' or … to [a]ffect a 'general hands-off policy relative to state rate making.'" *Tennyson v. Gas Serv. Co.*, 506 F.2d 1135, 1138

(10th Cir. 1974) (quoting 1A J. Moore, Federal Practice P0.206, at 2282 (1974)). The Johnson Act generally does not deprive a district court of jurisdiction "unless the challenge is to an 'order affecting rates' and each of the four enumerated conditions is present." *U.S. W., Inc. v. Tristani*, 182 F.3d 1202, 1207 (10th Cir. 1999). The party invoking the Johnson Act carries the burden of demonstrating that all four of the statutory requirements are present. *Id.* at 1207.

WIEC argues that the Court should dismiss this case under the Johnson Act because all four statutory requirements are present. [ECF No. 38, at 3–10]. Plaintiff counters that the first element of the Johnson Act is not met because preemption cases are not solely based on the Constitution. [ECF No. 43, at 7–9]. Additionally, Plaintiff contends that the second element is not met because the Order interferes with interstate commerce. *Id.* at 10–11. Plaintiff draws support for its arguments by using the reasoning followed in *PacifiCorp v. Hurless*, No. 2:04-cv-00131-ABJ (D. Wyo. Nov. 5, 2004),[2] which found the first element was not met because preemption claims do not implicate the Johnson Act. WIEC responds that *Hurless* differs from this case because the questions in *Hurless* were purely legal and dealt with the constitutionality of Wyoming's statutory scheme. [ECF No. 46, at 3]. WIEC further contends that rates do not interfere with interstate commerce because the Order did not affect matters within FERC's exclusive jurisdiction, as the Order only affects Wyoming retail customers. *Id.* at 6.

[2] The relevant document is the Order Denying Defendants' and Defendant-Intervenors' Motions to Dismiss, located at ECF No. 79. That case involved Plaintiff, the Commission's predecessors, and WIEC for similar claims. There, this District Court denied motions to dismiss on similar grounds.

As an initial matter, neither party appears to dispute that this is an order affecting rates. In determining whether an order affects rates, the Tenth Circuit broadly construes the Johnson Act to apply to any order affecting rates to effectuate the Johnson Act's general hands-off approach to protect state rate making from federal court interference. *See Norman Apartment Ass'n v. City of Norman*, 64 F. App'x 166, 168 (10th Cir. 2003); *see also Tennyson*, 506 F.2d at 1138. Upon reviewing the Order [ECF No. 37-1] and given the Tenth Circuit's broad approach, the Court agrees that this is an order affecting rate. Thus, the inquiry becomes whether WIEC has met its burden to demonstrate all four statutory conditions are satisfied. *See* 28 U.S.C. § 1342.

### ***A. Plaintiff's Preemption Claim Is Not Solely on Repugnance of the Constitution***

First, jurisdiction cannot solely be based on diversity of citizenship or repugnance of the Constitution. 28 U.S.C. § 1342. Here, Plaintiff brings this case into federal court under 28 U.S.C. §§ 1331 and 1337.[3] [ECF No. 1, at 3, ¶ 6]. In invoking jurisdiction, Plaintiff states that its claims arise under federal law because the Commission's Order violates the Commerce Clause and the Federal Power Act, which preempts conflicting state law under the Supremacy Clause. *Id.* Thus, because the case comes in under federal question jurisdiction, the question becomes whether jurisdiction is solely based on repugnance of the Constitution.

---

[3] Plaintiff alternatively bring this case under 28 U.S.C. § 1332. [ECF No. 1, at 4, ¶ 7]. However, this cannot form a basis for jurisdiction. Suits against state officials in their official capacity are treated as suits against the state, and a state is not a citizen under the Judiciary Acts. *See State Highway Comm'n of Wyo. v. Utah Const. Co.*, 278 U.S. 194, 199 (1929).

The Johnson Act deprives a federal court's jurisdiction when it solely, that is *exclusively*, rests on repugnance of the order to the Federal Constitution. *Int'l Bhd. of Elec. Workers, Loc. Union No. 1245 v. Pub. Serv. Comm'n of Nev.*, 614 F.2d 206, 210–11 (9th Cir. 1980). Courts have generally held that claims of preemption do not exclusively rest on repugnance of the Constitution. *Hawaiian Tel. Co. v. Pub. Utils. Comm'n of Haw.*, 827 F.2d 1264, 1273 (9th Cir. 1987) ("The Johnson Act applies 'only when [a challenge to a rate order] rests exclusively on 'repugnance of the order to the Federal Constitution.' … A claim of preemption does not meet this test." (alteration in original) (citations omitted)); *Freehold Cogeneration Assocs., L.P. v. Bd. of Regul. Comm'rs of State of N.J.*, 44 F.3d 1178, 1186 (3d Cir. 1995) ("[A] statutorily-based preemption claim does not provide a basis for invoking the Johnson Act to deprive a federal court of jurisdiction."); *Ark. Power & Light Co. v. Mo. Pub. Serv. Comm'n*, 829 F.2d 1444, 1449 (8th Cir. 1987) ("[A]ll of the appellate authority [o]n point of which we are aware upholds federal jurisdiction in utility rate cases where a substantial claim of federal statutory preemption is pleaded."); *Beckenstein v. Hartford Elec. Light Co.*, 479 F. Supp. 417, 420 n.1 (D. Conn. 1979) ("The Johnson Act, however, does not divest a federal court of jurisdiction where, as here, jurisdiction is based on an alleged violation of a federal statute and the complaint alleges interference with interstate commerce."). The rationale for this rule is, while the Supremacy Clause in the Constitution provides that federal law preempts conflicting state law, the meaning of the federal and state laws must be explored to reach a conclusion. *Ark. Power & Light Co.*, 829 F.2d at 1449. Since a preemption claim is based on *both* a federal statute and the Constitution, the claim extends beyond the Johnson Act's reach because it is no

longer *solely* based on the Constitution. *See New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 911 F.2d 993, 1005 (5th Cir. 1990) ("[T]he Johnson Act [is] not applicable to these proceedings, because the preemption claim was based on the Federal Power Act as well as the Constitution[.]")

In light of this general rule, the Court finds that WIEC has not met its burden to demonstrate this case is brought *solely* in repugnance of the Constitution. Here, Plaintiff alleges a statutorily-based preemption claim, namely that the Federal Power Act preempts the Commission's Order because it interferes with matters within FERC's exclusive jurisdiction. [ECF No. 1, at 18–26, ¶¶ 62–86]. Naturally, the Court will likely be tasked with interpreting the relevant provisions of the Federal Power Act and determine whether the Order violates it. Thus, Plaintiff's claims come under both the Federal Power Act and the Constitution and therefore is not based solely on the repugnance of the Constitution. *See New Orleans Pub. Serv., Inc.*, 911 F.2d at 1005.

WIEC relies on *Hill v. Kansas Gas Service Co.*, 323 F.3d 858 (10th Cir. 2003) for the proposition that "the Tenth Circuit rejected the argument that reliance on a federal statute to establish Fifth and Fourteenth Amendment claims defeats the Johnson Act." [ECF No. 46, at 5–6]. In *Hill*, the plaintiffs asserted claims under the Natural Gas Policy Act of 1978 and 42 U.S.C. § 1983 alleging deprivations of property without due process or just compensation related to refunds. 323 F.3d at 860–62. It is worth noting that the Tenth Circuit did not reach the issue of whether the claim came under the Constitution, as the plaintiffs waived these arguments by failing to raise them in the district court. *Id.* at 865–66. However, in dicta, the court reasoned that the case was likely brought under

repugnance of the Constitution because the federal statutes were simply used to establish a property interest—not to establish a violation of federal law. *Id.* at 866–67. In other words, the federal statutes were used to establish the existence of a constitutional claim. *Id.* at 867.

*Hill* is distinguishable from this case. Notwithstanding the fact that *Hill* was not a preemption case, Plaintiff alleges violations of a federal statute. [ECF No. 1, at 3, 20–21, 24–26, ¶¶ 3, 73, 82–86]. Plaintiff uses the statutes to establish a violation of federal law, and the case will likely involve a statutory analysis of whether the Order violates the Federal Power Act. In contrast, *Hill* would have required a constitutional analysis of whether the plaintiffs were truly deprived of property without due process or just compensation under the Fifth Amendment as applied through the Fourteenth Amendment. *See* 323 F.3d at 867. The cases differ substantially on how the statutes are used. Therefore, *Hill* does not preclude subject matter jurisdiction over Plaintiff's preemption claim, as it is not solely based on repugnance of the Constitution.

### *B. Plaintiff's Commerce Clause Claim May Affect Interstate Commerce*

Turning to Plaintiff's claim for violations of the dormant commerce clause, the Court notes it is unclear whether it should apply a claim-by-claim approach or not. Courts have struggled to decide whether a claim that is repugnant of the Constitution deprives the court jurisdiction over all claims. *See Abcarian v. Levine*, 972 F.3d 1019, 1031 n.1 (9th Cir. 2020) (expressing uncertainty, but ultimately declining to rule, on how to address this scenario). Conversely, it is unclear whether a valid preemption claim allows a constitutional claim to proceed because the claims in the aggregate are no longer solely based on repugnance of the Constitution. *Pub. Serv. Co. of N.H. v. Patch*, 167 F.3d 15, 25

(1st Cir. 1998) ("The literal language of the Johnson Act leaves some room to argue that the constitutional claims would also support relief simply because jurisdiction over the case would not have been based 'solely' on diversity or constitutional grounds." (dicta)). Some courts have dismissed claims which are repugnant of the Constitution while allowing preemption claims to proceed. *E.g.*, *Mid-Plains Tel. Co. v. Pub. Serv. Comm'n of Wisc.,* 745 F. Supp. 1450, 1452 (W.D. Wis. 1989). Other courts, including one in this Circuit, have allowed subject matter jurisdiction over all claims, even constitutional challenges, when one claim of preemption is a basis for jurisdiction. *E.g.*, *U.S. W. Commc'ns, Inc. v. Pub. Serv. Comm'n of Utah*, 991 F. Supp. 1299, 1300 (D. Utah 1998).

Nevertheless, the Court believes this question, as well as the question of whether Plaintiff's claim for a violations of interstate commerce come solely under repugnance of the Constitution, need not be addressed at this time.[4] Rather, the Court finds that alleged violations of the dormant commerce clause "if proven, would defeat the second condition of the Johnson Act." *Aluminum Co. of Am. v. Utils. Comm'n of State of N.C.*, 713 F.2d 1024, 1028 (4th Cir. 1983). Therefore, Plaintiff's dormant commerce clause claims are not defeated by the Johnson Act because, if Plaintiff proves the Order impermissibly interferes with interstate commerce, then the Johnson Act's second condition would not be met. *See id.*

[4] Plaintiff contends that "Commerce Clause claims are not based solely on the Federal Constitution." [ECF No. 43, at 7 n.1]. Certainly, some courts would seem to support this contention when the claims are coupled with an otherwise valid claim of preemption. *See Sierra Tel. Co., Inc. v. Reynolds*, 703 F. Supp. 3d 1163, 1176 (E.D. Cal. 2023). However, as stated, there are cases that indicate the contrary. *Mid-Plains Tel. Co.*, 745 F. Supp. at 1452. In any event, if the Court found that the Johnson Act requires a claim-by-claim analysis, the Court is hesitant to find that the alleged commerce clause violations do not come under solely repugnance of the Constitution.

To find a state order interferes with interstate commerce requires more than an incidental or indirect effect on interstate commerce. *U.S. W., Inc.*, 182 F.3d at 1211. Here, Plaintiff claims that it sells electricity and provides transmission service in interstate commerce. [ECF No. 1, at 5, ¶ 13]. The Complaint also alleges that the Order sought to reverse what WIEC perceived as Wyoming customers essentially funding Plaintiff's out-of-state customers. *Id.* at 27–28, ¶ 90. In doing so, Plaintiff states that WIEC effectively ignored or undid FERC-mandated hold back reserves to further local interests. *Id.* Additionally, Plaintiff contends WIEC representatives testified that the revenue shortfall allegedly caused by the Order could be recouped by raising the rates on out-of-state FERC customers. *Id.* at 28, ¶ 91. While one of these allegations alone may not be enough to establish an effect on interstate commerce, *see Qwest Corp. v. Lujan*, No. 05-530 WJ/DJS, 2006 U.S. Dist. LEXIS 114142, at *23 (D.N.M. Feb. 24, 2006) (finding the reallocation of resources were not enough to allege a substantial interference with interstate commerce), the aggregate of all these factual allegations could potentially interfere with interstate commerce. *Tri-State Generation & Transmission Ass'n v. Pub. Serv. Comm'n of Wyo.*, 412 F.2d 115, 118 (10th Cir. 1969) (holding the trial court erred in finding an electric company was not engaged in interstate commerce because "Commission action patently had the potential of interfering with interstate commerce and supports jurisdiction under 28 U.S.C. § 1342(2)"); *Fed. Elec. Regul. Comm'n v. Elec. Power Supply Ass'n*, 577 U.S. 260, 267 (2016), *as revised* (Jan. 28, 2016) ("Since the [Federal Power Act's] passage, electricity has increasingly become a competitive interstate business.").

WIEC contends that the Order does nothing to alter FERC-jurisdictional rates and only concerns intrastate matters. [ECF No. 46, at 6]. It appears the parties disagree with how WIEC calculated Plaintiff's FERC-mandated third-party reserves in creating its rate for Wyoming retail customers. *Compare* [ECF No. 37-1, at 22, ¶ 112] *with* [ECF No. 37-1, at 22, ¶ 113]. Whether this is an intrastate or interstate decision is not appropriate to resolve at the motion to dismiss stage. *See Ky. W. Va. Gas Co. v. Pa. Pub. Util. Comm'n*, 620 F. Supp. 1458, 1461 (M.D. Pa. 1985), *rev'd on other grounds*, 91 F.2d 1111 (3d Cir. 1986) ("Although defendants argue that only intrastate commerce is involved, for the purposes of the motions to dismiss, we believe that we must accept plaintiffs' contention concerning the affect upon interstate commerce.").

In conclusion, the Court cannot say, at this stage in litigation, whether the Commission's Order interferes with interstate commerce. Instead, Plaintiff pleaded enough factual allegations, which if proven may interfere with interstate commerce. *See Tri-State Generation & Transmission Ass'n*, 412 F.2d at 118. In any event, the Court finds that WIEC has not met its burden to prove that the Johnson Act's second statutory condition is satisfied. Therefore, to the extent the Court is required to apply a claim-by-claim analysis, Plaintiff's claims may proceed at this time because not all four statutory conditions are present.

## III. Conclusion on Subject Matter Jurisdiction

The Court concludes it has subject matter jurisdiction over Plaintiff's claims at this stage of litigation. However, the Court reminds the parties that subject matter jurisdiction may be raised at any time, even sua sponte. *See Kontrick v. Ryan*, 540 U.S. 443, 455 (2004).

If warranted based on factual developments, the Court may revisit this question. However, the Court will assume subject matter jurisdiction based on the foregoing reasons.

## IV. *Burford* Abstention Is Unwarranted

Both Defendants and WIEC argue that the Court should decline to exercise jurisdiction under the *Burford* abstention doctrine. [ECF No. 31, at 9–17]; [ECF No. 38, at 11–24]. Both contend that the Court should abstain because it is sitting in equity, federal review would disrupt state-court review of the Commission's decision, and timely and adequate state-court review is available. [ECF No. 31, at 9–17]; [ECF No. 38, at 11–24].

Defendants argue that this case involves complex issues of state law despite Plaintiff's attempt to isolate the federal issues. [ECF No. 31, at 12]. In support, they state that the Court will be tasked with analyzing the record "to determine the difference between the adjustment adopted by the Commission and the cost of providing third-party reserves under the FERC formula, and then determine whether that adjustment intruded into the purview of FERC's ratemaking authority." *Id.* at 13. According to Defendants, this determination would involve a review of the entire administrative record, which goes beyond the issues decided in *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 361 (1989). [ECF No. 31, at 12]. Thus, Defendants contend that the complex process of state utility rate should best be handled by the state administrative agency and reviewed by the State court. *Id.* at 14–15. Furthermore, Defendants highlight that Wyoming has a comprehensive judicial review process for state court review of an administrative action, and Plaintiff already filed a State court action on May 17, 2024. *Id.* at 15–16; *see* [ECF No. 31-1].

In arguing for abstention, WIEC further emphasizes that state law predominates this case and adds that Plaintiff provided a faulty calculation to account for its assumptions FERC-required third-party reserves. [ECF No. 38, at 14–18]. In doing so, WIEC contends Plaintiff failed to establish its state law burden to establish its costs, which would in turn would require the Court to delve into state law and the voluminous record to determine whether the Commission erred under state law. *Id.* at 17. Additionally, WIEC argues four considerations weigh in favor of abstention: (1) the public concern regarding these issues weighs in favor of abstention; (2) resolution of this case would involve inquiry into unsettled or unresolved complex issues of Wyoming law; (3) federal intervention would interfere with uniform application of state law; and (4) Wyoming's desire for state court review of public utility cases. *Id.* at 18–24.

Plaintiff responds to the foregoing arguments, contending that abstention is not proper in this case. *See* [ECF No. 41]; *see also* [ECF No. 43]. Plaintiff attempts to refocus the Court's inquiry to first decide whether it sits in equity and timely and adequate state court review is available, then turn to the two factors outlined in *New Orleans Public Service Inc.*, 491 U.S. 350. *See* [ECF No. 41, at 18 n.2; ECF No. 43, at 18]. In addressing those factors, Plaintiff argues that its claims are not based on state law and courts do not typically abstain in preemption cases like this one. [ECF No. 41, at 15–18; ECF No. 43, at 18–21]. Further, Plaintiff claims that all the other considerations highlighted by Defendants and WIEC are not present. [ECF No. 41, at 20–24; ECF No. 43, at 21–25].

A party may move to dismiss based on abstention under Rule 12(b)(1). *Sierra Club v. Chesapeake Operating, LLC*, 248 F. Supp. 3d 1194, 1199 (W.D. Okla. 2017). The

*Burford* abstention doctrine provides that a federal court sitting in equity should use its discretionary power to abstain from hearing cases involving "the rightful independence of state governments in carrying out their domestic policy." *Burford v. Sun Oil Co.*, 319 U.S. 315, 318 (1943) (quoting *Pennsylvania v. Williams*, 294 U.S. 176, 185 (1935)). It is an "extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." *Allegheny Cnty. v. Frank Mashuda Co.*, 360 U.S. 185, 188 (1959). Thus, the exercise of abstention is only justified in the "exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest." *Id.* at 189. When a court sits in equity and timely and adequate state-court review is available, the U.S. Supreme Court distilled the *Burford* doctrine to highlight two circumstances in which a district court shall abstain from interfering with state administrative agencies' proceedings:

> (1) when there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar"; or (2) where the "exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."

*New Orleans Pub. Serv., Inc.*, 491 U.S. at 361 (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 814 (1976)). A district court's decision to abstain is reviewed under an abuse of discretion standard. *Wildgrass Oil & Gas Comm. v. Colorado*, 843 F. App'x 120, 122 (10th Cir. 2021) (citing *Marshall v. El Paso Nat. Gas Co.*, 874 F.2d 1373, 1377 (10th Cir. 1989)). Each element will be addressed in turn.

**A. *Timely and Adequate State Court Review Is Available, and the Court is Sitting in Equity***

The Court finds the first two elements under *Burford* are met.[5] First, when state statutes provide for state court review of agency decisions, courts have generally found timely and adequate state court review. *See Wildgrass Oil & Gas Comm.*, 843 F. App'x at 122; *see also Robert-Gay Energy Enters., Inc. v. State Corp. Comm'n of Kan.*, 753 F.2d 857, 861 (10th Cir. 1985); *Burford*, 319 U.S. at 318. Here, the Court is satisfied that Wyo. Stat. Ann. §§ 16-3-114 through 115 provides timely and adequate state court review of the agency's decision. Second, courts sitting in equity can grant injunctive and declaratory relief. *See Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 718 (1996). Because Plaintiff requests both injunctive and declaratory relief, the Court is sitting in equity. Therefore, the *Burford*'s initial inquiry is satisfied, and the Court turns to whether either of the conditions are met.

**B. *There Are Not Difficult Questions of State Law Bearing on Policy Problems of Substantial Public Import Whose Importance Transcends the Result in This Case***

Defendants and WIEC argue that the issues in this case are intertwined with complex issues of state law. [ECF No. 31, at 12]; [ECF No. 38, at 14]. Defendants claim that ratemaking is a difficult process that Plaintiff attempts to oversimplify, and the Court will be required to analyze, not just the Order, but also the entire factual record to determine whether it violates state law. [ECF No. 31, at 13]. Going into more factual details, WIEC likewise argues that state law predominates this action and the Court would be required to

[5] While unclear, it does not appear that Plaintiff necessarily disputes these two elements are present. *See* [ECF No. 41, at 18 n.2].

assess whether the Commission violated state law when it found Plaintiff's calculation software was faulty. [ECF No. 38, at 17]. Additionally, WIEC contends that the issues in Plaintiff's Complaint are of particular public importance to the state of Wyoming and its citizens. *Id.* at 17–19. In essence, it asserts that the Commission found Plaintiff's modeling software was inaccurate and Plaintiff failed to carry its burden under state law to establish its cost to FERC-jurisdictional customers. *Id.* at 17–18. Last, WIEC contends that the inherent nature of ratemaking is a complex process, and a review would require "inquiry into unsettled, complex, technical, or unusual issues of Wyoming law, the administrative record below, and Wyoming policy of utility regulation for which Wyoming courts are a more appropriate venue." *Id.* at 22.

Because the Court does not believe that this case will require a substantial review of Wyoming law, the Court finds that this condition is not met. The Complaint does not claim Defendants violated state law. Instead, it essentially alleges that Defendants disregarded mandates required by a federal commission established through federal law. [ECF No. 1, at 17–18, 18–26, ¶¶ 58, 62–86]. Nothing in Plaintiff's Complaint, nor Defendants' and WIEC's exhibits, would appear to indicate complex state laws are invoked beyond the issue of preemption, which will only require analysis of whether the Order violates the Federal Power Act. Instead, it appears the complex areas of state law will be pursued in State court. [ECF No. 1, at 4, ¶ 10] ("In its appeal there, PacifiCorp will only pursue claims based on state law."); *see* [ECF No. 31-2] (declining to bring the preemption and dormant commerce claims).

The issues before the Court are whether the Order is preempted by the Federal Power Act, whether it violates the dormant commerce clause by the Commission engaging in local protectionism, and whether Plaintiff's constitutional rights were violated. The Court does not find that these issues in this case are so intertwined with complex issues of state law, as it will not be asked to determine whether a violation of state law occurred. *See Am. Elec. Power Co. v. Ky. Pub. Serv. Comm'n*, 787 F.2d 588 (6th Cir. 1986) (finding the trial court improperly abstained under *Burford* in a rate-making case because "the court here is not asked to review the validity under state law of the [Public Service] Commission order"); *Monongahela Power Co. v. Schriber*, 322 F. Supp. 2d 902, 916 (S.D. Ohio 2004), *as modified on reconsideration* (June 14, 2004) ("[Power company] claims here that … the [Public Service Commission's] order on its face conflicts with [Power company's] right to pass through the cost of power purchased under rates accepted by FERC under the Federal Power Act … [T]hese claims are distinctly federal and not entangled in complex state laws or local policy issues. *Burford* abstention, therefore, does not apply."); *Occidental Chem. Corp. v. La. Pub. Serv. Comm'n*, 494 F. Supp. 2d 401, 414 (M.D. La. 2007) (declining to abstain under *Burford* since preemption claims did not involve state law). Therefore, the Court finds that this case does not implicate difficult questions of state law bearing on policy problems of substantial public import in this case to justify abstention under *Burford*.

### C. *The Exercise of Federal Review in This Case Would Not Be Disruptive to State Efforts to Establish a Coherent Policy*

Both Defendants and WIEC argue that, if the Court were to inquire about the ratemaking process, it would need to engage in a detailed factfinding of the administrative record extending beyond the principals articulated in *New Orleans Public Service, Inc.*, 491 U.S. 350. [ECF No. 31, at 12]; [ECF No. 38, at 20–21]. Specifically, they claim that the Court will be tasked with going beyond the four corners of the Order. [ECF No. 31, at 12]; [ECF No. 38, at 20–21]. Additionally, both discuss the process of how rates are calculated to establish that federal review would be an overreach into the state's ratemaking processes. [ECF No. 31, at 14–15; ECF No. 38, at 22–23]. Last, both contend that intervention by the Court would undermine the Wyoming's substantial interest and ability to maintain uniformity in setting retail rate regulation. [ECF No. 31, at 14–15; ECF No. 38, at 22–23].

The Court is not persuaded by Defendants' and WEIC's arguments. U.S. Supreme Court precedent makes it clear that "States interfere with FERC's authority by disregarding interstate wholesale rates FERC has deemed just and reasonable, even when States exercise their traditional authority over retail rates or, as here, in-state generation." *Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 165 (2016); *see Pub. Serv. Co. of N.H. v. Patch*, 221 F.3d 198, 203 (1st Cir. 2000) ("*Burford* does not license a state to ignore FERC tariffs merely by saying, without any present rational basis, that the purchase is 'imprudent.'"). Logic would then follow that a federal court is an acceptable forum to determine whether Defendants disregarded rates deemed reasonable by a federal agency. *See sPower Dev.*

*Co., LLC v. Colo. Pub. Utils. Comm'n*, No. 17-CV-00683-CMA-NYW, 2018 WL 4368612, at *9 (D. Colo. June 18, 2018) ("[T]he *Burford* abstention is inappropriate where, like here, the plaintiff asserts a well-founded preemption claim.").

Unlike Defendants and WIEC's assertions, *New Orleans Public Service, Inc.* does not preclude courts from venturing beyond the four corners of a state utility commission's order. 491 U.S. at 363. Rather, that court found because it did not have to go beyond the four corners of the order, federal intervention would not unduly intrude on the state's ratemaking process. *Id.* In line with this rationale, the Court does not believe at the motion to dismiss stage that answering the three questions stated above[6] will be a significant intrusion into Wyoming's attempt to form a coherent and uniform state policy nor involve an analysis of inherently local issues. *See id.* at 363–64 ("[S]ince... wholesale electricity is not bought and sold within a predominantly local market, it does not demand significant familiarity with, and will not disrupt state resolution of, distinctively local regulatory facts or policies.").

In essence, "there is, of course, no doctrine requiring abstention merely because resolution of a federal question may result in the overturning of state policy." *Zablocki v. Redhail*, 434 U.S. 374, 379–80 n.5 (1978). While potential federal intrusion into a state's ratemaking process is no light task, the Court cannot ignore that Plaintiff's Complaint raises questions as to whether the Commission directly or indirectly violated matters within FERC's exclusive jurisdiction. *See Ky. W.Va. Gas Co. v. Pa. Pub. Util. Comm'n*, 791 F.2d

[6] Specifically, "[t]he issues before the Court are whether the Order is preempted by the Federal Power Act, whether it violates the dormant commerce clause by the Commission engaging in local protectionism, and whether Plaintiff's constitutional rights were violated." *Supra* p. 27.

1111, 1116 (3d Cir. 1986) (reversing a district court's abstention under *Burford* when gas companies "raised substantial questions concerning whether [federal laws] directly or indirectly preempt portions of [state's statutory framework] and the [Public Utility Commission's] Order."). Therefore, the Court finds that the exercise of federal review in this case would not be disruptive to state efforts to establish a coherent policy with respect to a matter of substantial public concern.

**D. *Conclusion on Abstention***

Because the Court does not find either of the *Burford* factors weigh in favor of abstention, the Court declines to abstain from the proceedings at this time. This is not a case that justifies the "extraordinary and narrow exception" to our duty to adjudicate a controversy properly before us. *Allegheny Cnty.*, 360 U.S. at 188.

**V. The Court Declines to Stay Proceedings**

Defendants and WIEC alternatively request the Court to stay proceedings until the State court issues are resolved and adjudicated. [ECF No. 31, at 18]; [ECF No. 38, at 24]. A court can "dismiss or stay a federal action in deference to pending parallel state court proceedings, based on considerations of [w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation." *Fox v. Maulding*, 16 F.3d 1079, 1080 (10th Cir. 1994) (alteration in original) (internal quotations omitted). "[M]ere potential for conflict in the results of adjudications, does not, without more, warrant staying exercise of federal jurisdiction." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 816 (1976). Granting a stay is an exceptional circumstance and reviewed under an abuse of discretion standard. *Moses H. Cone Mem'l*

*Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 19 (1983) (reversing a district court's decision to stay because there was no showing of exceptional circumstance).

Here, neither Defendants nor WIEC provide the Court with any support for why it should stay proceedings other than that a State court proceeding is currently ongoing. This is not an exceptional circumstance to warrant a stay. *See id.* Furthermore, as stated, Plaintiff has not persuaded its federal claims on appeal. [*See* ECF No. 1, at 4, ¶ 10]; [ECF No. 37-2]. Thus, the Court will allow the claims to proceed at this time, as neither party demonstrates an exceptional circumstance justifying a stay.

## CONCLUSION

Based on the foregoing analysis, the Court finds it has subject matter jurisdiction despite the Eleventh Amendment and the Johnson Act. Therefore, Plaintiff's claims are not dismissed under Rule 12(b)(1). The Court also finds that the case does not implicate exceptional circumstances to warrant abstention under *Burford* or a stay in proceedings.

NOW, THEREFORE IT IS ORDERED Defendants' Motion to Dismiss [ECF No. 30] is DENIED.

IT IS FURTHER ORDERED Intervenor Defendant Wyoming Industrial Energy Consumers' Motion to Dismiss or, in the Alternative, To Stay [ECF No. 37] is DENIED.

Dated this 1st day of October, 2024.

Kelly H. Rankin
United States District Judge

# Attachment 2

# Order Denying Commission's and WIEC's Joint Motion to Dismiss and Granting PacifiCorp's Motion for Summary Judgment, ECF No. 88 (Sept. 10, 2025)

FILED

10:00 am, 9/10/25

Margaret Botkins
Clerk of Court

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

PACIFICORP, d/b/a Rocky Mountain Power, an Oregon corporation,

Plaintiff,

vs.

MARY A. THRONE, CHRISTOPHER B. PETRIE, and MICHAEL M. ROBINSON, in their official capacities as Commissioners of the Public Service Commission of Wyoming,

Defendants,

vs.

WYOMING INDUSTRIAL ENERGY CONSUMERS,

Intervenor Defendant.

Case No. 24-CV-101-KHR

**ORDER DENYING DEFENDANTS' MOTION TO DISMISS [78] AND GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [55]**

This matter comes before the Court on Defendants' Motion to Dismiss [ECF No. 78] and Plaintiff's Motion for Summary Judgment [ECF No. 55]. After reviewing the relevant briefing and for the reasons discussed below, this Court denies Defendants' Motion and grants Plaintiff's Motion.

## BACKGROUND

This case arises out of a dispute concerning public utility rates. Plaintiff is a public electric utility company that serves customers in multiple states, including Wyoming. [ECF No. 1, at 4]. Defendants are the Commissioners of the Public Service Commission of Wyoming ("the Commission") which, among other responsibilities, sets retail rates for utilities sold within Wyoming, and the Wyoming Industrial Energy Consumers ("WIEC"). [ECF No. 55, at 6]. On March 1, 2023, Plaintiff submitted an application for a retail rate increase to Defendants. *Id.* As part of its application, Plaintiff provided its estimated net power costs ("NPC") which included "the sum of fuel expenses, wholesale purchase power expenses, and third-party wheeling expenses, less wholesale sales revenue" and is used to determine a reasonable retail rate for the utility company to charge intrastate consumers. *Id.* Plaintiff calculates its NPC using "a forecasting model that simulates the operation of its power system" called the Aurora Model.[1] *Id.* at 12. Generally, a higher NPC creates a higher revenue requirement and therefore a need for higher rates. *Id.*

The Federal Energy Regulatory Commission ("FERC") has exclusive jurisdiction over wholesale and interstate energy transmission and requires utility companies to maintain an Open Access Transmission Tarriff ("OATT") that establishes terms and prices for interstate transmission. In order to support reliable transmission service, FERC further requires public utilities to hold a certain portion of their energy generating capacity in reserve. *Id.* at 7. Because Plaintiff cannot sell these contingency reserves for profit, they

[1] Defendants dispute that the Aurora Model accurately estimated Plaintiff's NPC or was able to accurately account for reserves.

lower revenue for purposes of calculating NPC, which can have the ultimate effect of raising their revenue requirement. [ECF No. 57-8, at 61].

Upon reviewing Plaintiff's application for a rate increase, Intervenor Defendant WIEC objected to Plaintiff's calculations regarding its increased revenue requirement due to the contingency reserves. WIEC provided an adjustment based on the testimony of Bradley Mullins, an independent consultant. [ECF No. 57-6, at 3]. WIEC and Mr. Mullins argued that the inability to sell the reserves meant that Plaintiff incurred significant opportunity costs and that it was unreasonable for Wyoming ratepayers to subsidize other customers. [ECF No. 57-11, at 52]. WIEC suggested that if Plaintiff wished to recover its costs associated with third party reserves, it could do so through its "FERC rates." [ECF No. 57-8, at 65].[2]

Ultimately, WIEC recommended recalculating Plaintiff's NPC so that the modeled cost of third-party reserves to Wyoming consumers was no greater than the costs that Plaintiff recovers from Wyoming residents. *Id.* at 53. The effect of this adjustment was to reduce Plaintiff's NPC by roughly $163 million on a total company basis and by $23.5 million on a Wyoming-allocated basis. [ECF No. 57-12, at 5].

The Commission adopted this adjustment in full, writing that:

> The Commission concludes an adjustment to the third-party reserve costs is appropriate. The Commission finds the testimony of WIEC witness Bradley G. Mullins credible and persuasive. Mr. Mullins argues an adjustment is needed to revalue third-party reserves in NPC in the same manner that FERC

[2] Mr. Mullins testified: "It is unreasonable to require ratepayers in Wyoming to subsidize the cost of serving non-native loads and resources, and accordingly the revenue shortfalls above are not reasonably considered in the NPC forecast. If [Plaintiff's] FERC-approved OATT rates are inadequate to recover its cost of serving non-native customers, it would be most appropriate for [Plaintiff] to seek to recover the funds through its FERC rates, not through an increase to Wyoming customers' rates." [ECF No. 57-8, at 65].

> values them. He states this ensures Wyoming PSC-jurisdictional customers do not subsidize FERC-jurisdictional customers. That adjustment, as outlined in WIEC's post-hearing brief, appropriately apportions the costs between FERC jurisdictional customers and Wyoming ratepayers. Accordingly, the Commission adopts his adjustment.

[ECF No. 37-1, at 44].

## RELEVANT LAW

### *I. Law regarding Motion to Dismiss*

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides that a party may respond to a complaint with a defense for the "failure to state a claim upon which relief can be granted." In reviewing a 12(b)(6) motion, a court should "accept as true all well-pleaded factual allegations in a complaint in a light most favorable to the plaintiff." *Smith v. U.S.*, 561 F.3d 1090, 1098 (10th Cir. 2009). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citations and quotation marks omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when a plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Plausibility does not equal probability. *Id.* A plaintiff must show more than a sheer possibility that the defendant acted unlawfully, passing the line from speculation or

conceivability to plausibility. *Id.*; *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008). Labels, legal conclusions, and formulaic recitations of the elements are insufficient to survive a motion to dismiss. *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012).

*II. Law regarding Motion for Summary Judgment*

Rule 56 of the Federal Rules of Civil Procedure provides a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgement as a matter of law." A fact is material if it is necessary to determine the outcome of the case. *Roberts v. Jackson Hole Mountain Resort Corporation*, 884 F.3d 967, 972 (10th Cir. 2018). A dispute is genuine if evidence exists that may lead a reasonable trier of fact to return a verdict for the non-moving party. *Olivero v. Trek Bicycle Corporation*, 291 F. Supp. 3d 1209, 1218 (D. Colo. 2017). When determining whether a genuine dispute of material fact exists, a court will draw all favorable inferences of factual ambiguities in favor of the non-movant. *Morlock v. United Parcel Service, Inc.*, No. 08-CV-44, 2008 WL 11411456, at *2 (D. Wyo. Oct. 9, 2008).

If a movant meets their burden in showing that no genuine dispute exists, the non-movant must submit sufficient evidence in specific factual form showing that a dispute does exist. *Id.* This requires more than a scintilla of evidence—providing more than mere assertations and conjecture. *Brennan v. Jackson Hole Snowmobile Tours, Inc.*, No. 08-CV-265, 2009 WL 10700292, at *2 (D. Wyo. Aug. 4, 2009). "[S]ummary judgment is appropriate when the non-movant is unable to present facts on which a reasonable jury could find in his or her favor." *Id.* In sum, summary judgment is an opportunity to

determine the legal sufficiency of a claim to proceed to trial, not to balance or weigh factual disputes.

## RULING OF THE COURT

The issues before the Court are whether the dispute regarding the 2024 Order is now moot given the superseding 2025 Order and whether the adjustment made to Pacificorp's estimated NPC impermissibly interfered with FERC jurisdiction. The Court addresses these issues in turn.

### I. Defendants' Motion to Dismiss

Defendants move to dismiss Plaintiff's suit, arguing that the expiration of the 2024 Order at issue in this case renders Plaintiff's claims moot. Plaintiff opposes this motion, arguing that the suit is not moot because the 2025 Order implicates the same trapped-costs issue, meaning that the central controversy survives the expiration of the 2024 Order. Plaintiff also argues that, even if the issue is moot, it falls under the 'capable of repetition, yet evading review' exception to mootness.

The mootness inquiry centers on "whether granting a present determination of the issues offered. . . .will have some effect in the real world." *Smith v. Becerra*, 44 F.4th 1238, 1247 (10th Cir. 2022). "Mootness is a threshold issue because the existence of a live case or controversy is a constitutional prerequisite to federal court jurisdiction." *Schell v. OXY USA Inc.*, 814 F.3d 1107, 1114 (10th Cir. 2016). Therefore, a court must dismiss an action where any "decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *Id.*

Because "[t]he concept of mootness is placed under some strain in the context of administrative orders whose formal legal effect is typically shortlived," several exceptions to the mootness doctrine exist, including where the challenged action is "capable of repetition, yet evading review." *Tenn. Gas Pipeline Co. v. Fed. Power Comm'n*, 606 F.2d 1373, 1379 (D.C. Cir. 1979); *Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 377 (1979). This exception requires that "(1) the challenged action must be in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there must be a reasonable expectation that the same complaining party will be subjected to the action again." *Fischbach v. N.M. Activities Ass'n*, 38 F.3d 1159, 1161 (10th Cir. 1994) (cleaned up).

The Court finds that the controversy regarding the 2024 Order is not moot. While the Order itself may have been superseded by a new order, the central controversy regarding the alleged imputation of costs appears to be alive and well. Plaintiff continues to allege that Defendants impermissibly ignore third-party reserves and impermissibly trap costs in their 2025 Order. In *Bebchick v. Public Utilities Commission*, the D.C. Circuit confronted the issue of mootness in the context of public utility orders and found that "[a] rate order such as the one before us is not mooted by another which has the effect of keeping the controversy alive." 318 F.2d 187, 189–90 (D.C. Cir. 1963). Similar to the transit rate increase that continued past the original order in *Bebchick*, the dispute over trapped costs survives the expiration of the 2024 Order.

Defendants' opposition on this front appears to depend on the fact that the 2025 Order does not rely on the Aurora Model. Defendants' position misframes both the record and the nature of Plaintiff's Complaint. While there is evidence in the record that the

Commission found faults in the Aurora Model, there is also evidence that the Commission made an adjustment to Plaintiff's NPC based on its belief that Plaintiff's OATT unfairly apportioned costs between Wyoming customers and other ratepayers. Plaintiff's argument is that this adjustment intruded on FERC's exclusive jurisdiction. That is the controversy that apparently survives the expiration of the 2024 Order, and Defendants do not meaningfully explain why these allegations are insufficient in the context of a motion to dismiss. Defendants also cite a string of state cases that have little bearing on the issue before this Court because they do not involve federal preemption.

This finding also helps explain why Plaintiff's claims continue to adequately allege prospective relief for Eleventh Amendment purposes. Plaintiff continues to seek injunctive relief to force Defendants to refrain from adjusting their retail rates using allegedly preempted rationale in the future. *See Edelman v. Jordan*, 415 U.S. 651 (1974); *Milliken v. Bradley*, 433 U.S. 267, 289 (1977) (holding that *Ex Parte Young* "permits federal courts to enjoin state official to conform their conduct to requirements of federal law"); *Kimble v. Solomon*, 599 F.2d 599, 603–04 (4th Cir. 1979). These parties will, annually, go through the process of negotiating rates for Wyoming consumers. Because Plaintiff continues to allege prospective relief, this Court finds that the case is not mooted by the supersession of the 2024 Order.[3]

For similar reasons, the Court finds that the capable of repetition yet evading review exception to mootness applies. Each order is in effect for one year, which is an insufficient

[3] To the extent that Defendants argue that the ECAM proceeding, which reconciles estimated NPC and actual NPC at the end of the year, forecloses Plaintiff's claims, the Court fails to understand how a subsequent state proceeding that *may* return some of Plaintiff's losses should have any bearing on a federal court mootness inquiry.

time to fully litigate this issue from the filing of the complaint to a potential trial on the merits. Further, it is quite clear from the parties' filings that the issue regarding trapped costs will continue to rear its head.

Having concluded that this dispute is not moot, the Court denies Defendants' Motion to Dismiss. The Court now moves to consider Plaintiff's Motion for Summary Judgment.

**II. Plaintiff's Motion for Summary Judgment**

Turning to the Motion for Summary Judgment, Plaintiff argues that the WIEC and the Commission's adjustment to Plaintiff's estimated NPC impermissibly interfered with FERC-mandated third-party reserves. More specifically, Plaintiff argues that the Commission's order fails to account for the fact that Plaintiff cannot sell its third-party reserves into the market in the way that the WIEC adjustment presupposes pursuant to its "opportunity cost" theory, and that the consequent lowering of Plaintiff's NPC "trapped" Plaintiff's costs.

Defendants contend that the ultimate dispute is about the Aurora model that produced Plaintiff's own estimation of their revenue requirement, which they argue inaccurately forecasted Plaintiff's NPC. Additionally, Defendants argue that the Commission did not interfere with any FERC-approved rates.

Under the Federal Power Act ("FPA"), FERC has "exclusive jurisdiction over wholesale sales of electricity in the interstate market." *Hughes v. Talen Marketing, LLC*, 578 U.S. 150, 150 (2016). In *Montana-Dakota Utilities Co. v. Northwestern Public Service Co.*, the United States Supreme Court held that:

> [T]he right to a reasonable rate is the right to the rate which [FERC] files or fixes, and that, except for review of [FERC's] orders, the courts can assume no right to a different one on the ground that, in its opinion, it is the only or the more reasonable one.

341 U.S. 246, 251–52 (1951). Since *Montana-Dakota*, the "filed-rate" doctrine has operated to invalidate determinations of courts and state utility commissions where their decisions concerning intrastate rates conflict with the authority vested in FERC by Congress. *See Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571 (1981); *Nantahala Power and Light Co. v. Thornburg*, 476 U.S. 953, 965 (1986). In short, "[o]nce FERC sets. . . .a rate, a State may not conclude in setting retail rates that the FERC-approved wholesale rates are unreasonable. A State must rather give effect to Congress' desire to give FERC plenary authority over interstate wholesale rates, and to ensure that the States do not interfere with this authority." *Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 373 (1988).

While FERC's exclusive jurisdiction exists in the context of wholesale rate-setting, "a utility's costs based upon a FERC-filed rate must be treated as a reasonably incurred operating expense for the purposes of setting an appropriate retail rate." *Nantahala*, 476 U.S. at 967. Furthermore, the filed rate doctrine is not limited to only rates and applies to FERC's decisions regarding interstate wholesale power generally and the costs incurred from compliance with those decisions. *Id.* at 966. In *Nantahala*, the Supreme Court addressed a state commission's order that had concluded that a FERC-approved allocation of wholesale power costs between subsidiaries did not need to be reflected in differing in-state retail rates. In overturning the state supreme court's judgment, the Court held that

"[w]hen FERC sets a rate between a seller of power and a wholesaler-as-buyer, a State may not exercise its undoubted jurisdiction over retail sales to prevent the wholesaler-as-seller from recovering the costs of paying the FERC-approved rate. Such a 'trapping' of costs is prohibited." *Id.* at 970. Because the state commission's order rendered the plaintiff unable to recover its costs associated with the FERC-approved allocation agreement, the Court found that the order violated the Supremacy Clause.

The same issue arises in this case. The Commission's finding that it was unfair for Wyoming retail customers to subsidize FERC-jurisdictional customers reflects their apparent decision that Wyoming retail rates should not be raised to account for the costs of maintaining FERC-mandated third-party reserves. While Defendants associate the Commission's rate increase with a dispute over the Aurora Model used by Plaintiff, the record indicates that WIEC and, by adoption, the Commission thought it unreasonable for Plaintiff to seek to recover its costs incurred due to compliance with FERC requirements. This finding is quite explicitly barred by *Nantahala*, which makes clear that state utility commissions must allow utility companies to recover its costs from such regulations by setting appropriate retail rates.

As observed in *Nantahala*, a state commission is not invariably required to increase retail rates in response to a FERC-approved cost. Such a commission is well entitled to raise rates "if costs *other than* those resulting from the purchases of FERC-regulated power or gas were to decrease." *Id.* at 968 (emphasis in original). Had the Wyoming Commission accepted the costs associated with the federally required maintenance of third-party reserves but concluded, for other reasons, that Plaintiff's estimated NPC was too high, there

would be no preemption issue.[4] However, the evidence here indicates that the Wyoming Commission prevented Plaintiff from recovering its costs associated with the maintenance of third-party reserves on the theory that it was unfair for Wyoming customers to subsidize FERC-jurisdictional customers. Defendants argue that their adjustment adheres more closely to FERC-approved costs than did Plaintiff's estimate, but it is far from clear that this was the motivating factor behind the adjustment. Mr. Mullin's testimony that "[i]f [Plaintiff's] FERC-approved OATT rates are inadequate to recover its cost of serving non-native customers, it would be most appropriate for [Plaintiff] to seek to recover the funds through its FERC rates, not through an increase to Wyoming customer's rates" indicates that the Commission made an adjustment because it was dissatisfied with the allocation of costs between in-state customers and other customers. [ECF No. 57-8, at 65].

This is precisely the reasoning prohibited by *Nantahala* and similar cases. Furthermore, suggesting that Plaintiff's FERC-approved OATT rates might be inadequate seems tantamount to finding that they are unreasonable, which is the essence of state action that the filed rate doctrine was created to prohibit. Because these statements appear on the face of the Commission's Order, the Court finds that there is no genuine dispute of material fact that that aspect of the Order is preempted by federal law. Accordingly, Plaintiff's Motion for Summary Judgment is granted.

---

4 The Commission was clearly entitled to find that the Aurora Model overestimated Plaintiff's costs associated with maintaining third-party reserves and adjust their estimated NPC accordingly. The Court expresses no opinion on the reliability of the Aurora Model. However, the Court cannot ignore what appears on the face of the Commission's Order.

## CONCLUSION

The Court finds that the case is not moot and that the Commission's Order as to third-party reserves is preempted by federal law.

IT IS ORDERED that Defendants' Motion to Dismiss [ECF No. 78] is DENIED.

IT IS FURTHER ORDERED that Plaintiff Pacificorp's Motion for Summary Judgment [ECF No. 55] is GRANTED.

IT IS FURTHER ORDERED that Defendants are enjoined from enforcing their ruling regarding third-party reserves in this case or in future rate cases.

Dated this 10th day of September, 2025.

Kelly H. Rankin
United States District Judge

# Attachment 3

# Final Judgment, ECF No. 89 (Sept. 10, 2025)

FILED
10:04 am, 9/10/25
Margaret Botkins
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

PACIFICORP, d/b/a Rocky Mountain Power, an Oregon corporation,

Plaintiff,

vs.

MARY A. THRONE, CHRISTOPHER B. PETRIE, and MICHAEL M. ROBINSON, in their official capacities as Commissioners of the Public Service Commission of Wyoming,

Defendants,

vs.

WYOMING INDUSTRIAL ENERGY CONSUMERS,

Intervenor Defendant.

Case No. 24-CV-101-R

**FINAL JUDGMENT**

The Court, having granted Plaintiff's Motion for Summary Judgment [ECF No. 55], entered on September 10, 2025, which is fully incorporated by this reference, and with all causes of action having been disposed of,

IT IS ORDERED that Final Judgment is hereby entered in accordance with the Order Granting Plaintiff's Motion for Summary Judgment [ECF No. 88] and this action is closed.

Dated this 10th day of September, 2025.

Kelly H. Rankin
United States District Judge